# IN THE OREGON TAX COURT

## BRENNER
*v.*
## DEPARTMENT OF REVENUE
(TC 1809)

Steven M. Cyr, Knappenberger & Tish, P.C., Portland, represented plaintiff.

Ted E. Barbera, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered February 2, 1983.

**CARLISLE B. ROBERTS, Senior Judge.**

The plaintiff appealed from the defendant's Order No. I 82-25, increasing plaintiff's taxable Oregon personal income for each of the tax years 1976, 1977 and 1978, based upon an indirect methods audit. Three issues are before the court. The plaintiff alleges that:

(1) The defendant's "Second Notice of Assessment," dated December 31, 1980, for each tax year, was beyond the statutory three-year period of assessment, as described in ORS 314.410, for the tax year 1976 (Pl Comp, ¶ XIII);

(2) The Department of Revenue hearing officer relied upon information submitted by the defendant after the hearing officer's stated 60-day period for filing briefs and the plaintiff was given no opportunity to respond (Pl Comp ¶ XVII); and

(3) The defendant's assessment of deficiency in each year is incorrect.

In considering the first issue, it was agreed by counsel that the plaintiff timely filed a personal income tax return for the tax year 1976; therefore, it is considered filed on April 15, 1977. ORS 316.407 and 316.417. A notice of deficiency was issued April 4, 1980. ORS 314.410(1) states that:

"At any time within three years after the return was filed, the department may give notice of deficiency as prescribed in ORS 305.265."

Therefore, the notice of deficiency was timely.

After a conference on July 21, 1980, a notice of tax assessment reflecting a reduced deficiency was issued on December 31, 1980. (Def Ex J.) ORS 314.410(4) required that the notice of tax assessment must be mailed within one year from the date of the notice of deficiency. The defendant mailed plaintiff a notice of assessment on December 31, 1980, well within the one-year limitation.

The plaintiff appears to have confused the required notice of deficiency with the required notice of assessment. The notice of deficiency (Def Ex J, Form 150-850-112) was issued to plaintiff within three years of the time following the filing of a tax return; it carried a notation, "* * * Please examine the enclosed audit report for an explanation of the *proposed* adjustments. * * * Unless you pay or protest this deficiency, * * * a *Notice of Assessment* will be mailed to you. * * *" (Emphasis supplied.)

ORS 314.410(4) requires that the notice of assessment must be mailed to the taxpayer within one year of the notice of deficiency unless an extension of time is agreed upon. After a conference in July 1980, the plaintiff's reduced notice of assessment was mailed December 31, 1980, approximately nine months after the notice of deficiency was issued. Therefore, the assessment was timely issued. The plaintiff's appeal to the defendant resulted in an affirmance of the assessment. The court finds that the defendant followed the statutory procedure and that the assessment for 1976 was valid.

The second issue to be determined is whether Ms. Bonni Canary, Department of Revenue hearing officer, relied upon information submitted by the defendant after a required 60-day period with no opportunity for the plaintiff to respond. Ms. Canary testified that at the plaintiff's hearing on August 6, 1981, she requested additional information from the plaintiff and the defendant to be submitted by a certain date. The defendant submitted the information on November 18, 1981 (Def Ex H), after the deadline set by Ms. Canary, along with a copy to the plaintiff. Ms. Canary testified that defendant's letter raised no new issues that had not been discussed at the August 6 hearing and that it was not "* * * necessary to my decision * * *. It was more of a 'rehashing' than any new information." (Tr 9.)[1]

After hearing the testimony, the court is convinced that there was no impropriety involved, although there was a failure by counsel in that the defendant's memorandum was submitted after the deadline set by Ms. Canary. She testified

---

[1] References to "Transcript" herein relate to an *unofficial* transcript of audio tapes which is a part of the judge's file, prepared at his request and at the court's expense.

that her decision was not influenced by the document; indeed, that no new material was introduced and the court, being persuaded that this is true, finds that plaintiff's allegations that Ms. Canary relied upon the late information submitted by the defendant, to the detriment of the plaintiff, is unfounded.

The final issue is the determination of the correctness of each of the three assessments.

The office audit for the three subject years was begun by Mr. William Eigner, a veteran auditor of the Department of Revenue who retired before completion of the project. He was assisted by Mr. Kenneth C. Cuyler, for 17 years an auditor for the department employed in the Portland branch. Mr. Cuyler continued the audit, following methods used in the situation where a taxpayer's income tax returns are deemed to be based on inadequate records.[2]

■ Mr. Cuyler used a "T-account method" or "cash resources versus cash expenditures method" (Tr 115), in which the auditor first obtains the taxpayer's original records, cancelled checks, bank statements and other available data. All gross receipts are listed in the left-hand column of the T account, all identifiable expenditures are placed in the right-hand column. (The income tax returns aid classification.) This statement is given to the taxpayer. To the extent that the

---

[2] "Conventional audit techniques employed by the IRS are at times inadequate, if not completely useless, to prove that a taxpayer has failed to report all of his taxable income. On such occasions, the government may resort to one or more indirect methods of detecting unreported income. These special methods are commonly referred to as (1) cash transaction ("T" account), (2) bank deposits, (3) net worth, and (4) source and application of funds (or expenditures). Although utilized extensively in potential fraud cases, both civil and criminal, they also are employed where only a civil tax deficiency may be involved.

"The IRS agent does not approach a typical examination with the intention of resorting to an indirect method of proof. However, if books and records are unavailable for any reason, or are obviously incomplete or inaccurate, he usually has no alternative but to attempt a reconstruction of income by one of the accepted methods. Even where the books and records appear to be complete, correct, and internally consistent, suspicions raised by recurring or large business losses, unrealistically low income for the nature of the business, informants' tips as to omitted income, raw bank deposits greatly in excess of reported gross receipts, or a living style inconsistent with reported income may cause the agent to employ one of the indirect audit techniques." (Quoted from Richard A. Petrie, 54 Wis Bar Bull, No. 11 (Nov 1981), reprinted in *Digest of Tax Articles,* 31 (Sept 1982).)

expenditures exceed receipts, the taxpayer is asked to show cause why the surplus expenditures should not be charged to him as unreported income. As the taxpayer produces verified or acceptable evidence affecting any item or either column, adjustments are made.[3] In the present suit, at least three successive statements were developed over a period of time (chiefly favoring the taxpayer) and additional changes were made in the taxpayer's favor by the department's conference officer.

The plaintiff testified that, after the department's audit began, he discovered an omitted item of $640 on the 1976 return, a $1,000 capital gain that should have been reported on the 1977 return and an underreported gain of $1,195 on property at 1460 N.E. Paropa Court. Other than these adjustments, the plaintiff alleged that the returns were "completely correct." (Tr 36-37.)

The plaintiff contends that "misclassification" of checks by the defendant is a major factor in the discrepancy between his figures of taxable income and those of the defendant's auditor. The plaintiff, a dealer in real estate for himself and for clients, contends that many checks for business or rental expenses were classified by the defendant as nondeductible items.

Mr. Brenner testified that he would classify himself as a good bookkeeper but that with regard to "Detailed records of potential tax deductions on — my method was — I would have to say not great detail in that line." (Tr 36.) "I did my own bookkeeping." (Tr 75.) Alleging that there were more expenses than he claimed on his tax returns, Mr. Brenner explained that when he incurred a business or rental expense, he didn't put it in his books; instead, he "* * * categorized the receipt into folders. * * * [T]he nature of my classification * * * of business versus personal items was not listed per item as I received them * * * but rather stuck them in a folder throughout the course of the year and only drew upon those ones that I was going to use." (Tr 76.) He testified that he sought to avoid a tax audit by not claiming excessive deductions, even though legitimate.

---

[3] For background in tax administrators' auditing methods, see Research Institute of America, *Federal Tax Coordinator 2d,* ¶ G-2200 et seq., especially ¶¶ G-2245 and G-2250.

The plaintiff testified that some of his gross receipts were a result of borrowing against equities in real property, loans from friends, a $3,000 "gift" from his grandmother, a loan of $2,500 from his ex-wife and unsecured loans from the U. S. National Bank.

Mr. Brenner stated that he received a total of $3,000 from his grandmother. In his testimony, he often referred to the sum as a *gift,* paid in small amounts through January and February of 1976. He supplied Mr. Cuyler with a notarized document signed by his mother in support of this transaction. This document, Defendant's Exhibit K, declares that Vela Eubanks *loaned* the plaintiff $3,000 on March 15, 1976. The document was subscribed and sworn to before a notary on September 20, 1979. (The signature of the mother is undecipherable on the exhibit.)

No evidence other than the plaintiff's oral testimony was offered regarding other loans from friends and from the plaintiff's former wife or the alleged repayment of loans. In connection with proceeds of $7,935 from a sale of property on October 18, 1976, Mr. Brenner testified that he sold the house to his secretary and in order for her to borrow enough funds, he inflated the sales price and then gave $2,500 in cash net proceeds back to the purchaser. He stated that he reported his capital gain based upon the gross sale price. (Tr 47.)

The plaintiff alleged that his home telephone was used for business 50 percent of the time; therefore, one-half of the expense should be a deductible business expense. No telephone bills were produced nor other supporting evidence offered. Mr. Brenner also asserted that 75 percent of his Bank Americard charges were deductible business expenses. No receipts were offered to substantiate the expenses. When cross-examined as to how he arrived at his estimate of 75 percent business use, he replied: "I used it three-fourths of the time * * *." (Tr 107.)

Respecting misclassification of checks given during 1976, Mr. Brenner alleged that check No. 179 to Texaco for gas was mostly for business use; he offered no estimate of what percentage was proper. (Tr 61.) Again, no documentation was offered.

Mr. Brenner's attempts to classify checks based

mainly on memory proved to be a difficult task, as illustrated by his answer (on direct examination) concerning check No. 185:

"Q    * * * Was that a rental or a personal expense?

"A    Who is the check written to?

"Q    It was written to Sears.

"A    Sears? Sears and Roebuck? That would be a personal item.

"Q    That was not supplies for —

"A    * * * I would have to say that * * * back up and change that decision to more of a buying tools, whatnot, for a rental business. * * *" (Tr 62.)

■        ORS 316.007 expresses the policy of the Oregon Legislative Assembly that Oregon's personal income tax laws shall follow the federal income tax law relating to the measurement of taxable income of individuals. ORS 316.217 requires the individual income taxpayer to utilize the same accounting principles on his Oregon income tax return as he uses for federal purposes. Oregon's individual personal income tax return (Form 40) is incomplete unless there is attached thereto a copy of the taxpayer's federal income tax return (with forms and schedules) for the same tax year.

■        Accordingly, the Department of Revenue has the power to follow and does follow federal income tax requirements as to taxpayers' record keeping and reporting. The maintenance of records by a taxpayer is a primary requisite for the proper determination of his federal tax liability (and, therefore, of his Oregon tax liability). IRC (1954), § 6001, imposes the duty to keep records by the following mandatory provisions:

"Every person liable for any tax imposed by this title [of the IRC], or for the collection thereof, shall keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary [of the U.S. Treasury] may from time to time prescribe. Whenever in the judgment of the Secretary it is necessary, he may require any person, by notice served upon such person or by regulations, to make such returns, render such statements, or keep such records, as the Secretary deems sufficient to show whether or not such person is liable for tax under this title."

Failure to meet the adequate record keeping compelled by § 6001 of the IRC grants to the Commissioner of Internal Revenue the potential right, under § 446, to refuse acceptance of inadequate records and then to compute taxable income by such method as he deems proper clearly to reflect income. The necessary books or records are required to be retained "so long as the contents thereof may become material in the administration of any internal revenue law." (IRC (1954), Reg § 1.6001-1(e).)

Under the federal income tax law, a taxpayer acts at his peril when he fails to keep adequate records. As stated in 2 Mertens, *Law of Federal Income Taxation,* § 12.12:

"Our system of income tax collection relies upon individual self-assessment in which taxpayers are required to file returns setting forth their income, their deductions, and a self-computed tax. Taxpayers are required to keep such books and records as are sufficient to provide the information needed for filing the required returns. Farmers and wage earners are required to keep records, but are exempt from the requirement to keep a set of books; they must, however, keep such records as will enable the Commissioner [of Internal Revenue] to determine taxable income. * * *

"Estimates of income by the taxpayer are not ordinarily acceptable. But frequently for lack of evidence estimation by the Commissioner is to a degree unavoidable; the Commissioner has resorted to various sources of information, such as bank deposits. The Commissioner's reconstruction of income will be presumed correct with the burden on the taxpayer to disprove his crude computation. * * * The fact that the Commissioner erred in some respects in his computation does not suffice to show his method of reconstructing income is improper. However, the courts have sometimes rejected a method of reconstructing income as being arbitrary. It is well settled that where a taxpayer has failed to keep books or records from which his correct income can be ascertained, the Commissioner has the right to look elsewhere for evidence. * * * Where the books do not clearly reflect income, the Commissioner has a statutory right to determine net income by another method without exhausting all available means of adjusting the books to clearly reflect income. It is unquestionably correct to say that the existence of unreported income may be demonstrated by any practicable proof that is available in the circumstances of the particular situation. * * *"
(Footnotes omitted.)

The Director of the Department of Revenue has the same powers as those of the Commissioner described above.

Mr. Brenner is capable, intelligent and personable. Nothwithstanding the multiplicity and complexity of his business and personal affairs, he chose to keep grossly inadequate records for tax purposes. Upon his income tax returns being questioned, he was given every opportunity to add to, verify or correct the data available to the state's auditor, the conference officer, the hearing officer and this court. His counsel, through an extreme use of leading questions, was allowed to lead him through his direct examination (there being no objection by defendant). In spite of this full opportunity, he has not sustained the burden of proof imposed upon him by ORS 305.427. A lack of records resulted in a lack of answers. There were failures to substantiate allegations and there were unanswered questions left dangling by plaintiff's contradictions in his own testimony.

During a recess in the proceeding, counsel, at the court's request, went over plaintiff's Exhibits Nos. 6 and 8, dealing with alleged classification errors covering tax years 1977 and 1978, once again. They were able to agree on the classification of more than half the checks in dispute. The parties could not agree on the proper classification for check Nos. 191, 195, 226, 232, 277, 308, 324, 339, 410, 412 and 475 given in 1977 and check Nos. 479, 515, 517, 562, 619, 627, 636, 673, 677, 687, 704, 711, 750, 512, 560, 613 and 732 given in 1978. (Tr 94-105.)

The assessed deficiencies for 1976, 1977 and 1978 are affirmed, subject to any modifications approved by defendant's counsel in consequence of the recess conference, referred to above. The modifications, if any, shall be specified in a form of decree to be prepared by defendant for the court's use, pursuant to Tax Court Rule 68.

Defendant is entitled to its costs and disbursements.