IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| DONALD P. DANIELSON and SENDA R. DANIELSON, | ) ) ) | |
| Plaintiffs, | ) ) | TC-MD 160282C |
| v. | ) ) | |
| DEPARTMENT OF REVENUE, State of Oregon, | ) ) ) | |
| Defendant. | ) | **FINAL DECISION**[1] |

This is one of four cases concerning appeals of assessments arising from adjustments to

the S corporation returns of a construction business owned by twin brothers.[2] TC–MD 160282C

and 160283C concern adjustments to the company's business expense deductions for tax years

2012 and 2013. TC–MD 160367G and 160368G concern adjustments to the company's gross

income for tax year 2009 and to the company's business expense deductions for tax years 2009

and 2010.[3] All four cases were tried concurrently on January 4, 2017, and on February 2, 2017.

Dale R. Kennedy, attorney at law, appeared on behalf of Plaintiffs. Plaintiff David P. Danielson

and Robert E. Faler, CPA, testified for Plaintiffs. Nancy Berwick of Defendant's Audit Unit

appeared and testified for Defendant. Plaintiffs' exhibits 1 to 29 and Defendant's exhibits A to

---

[1] This Final Decision incorporates without change the court's Decision, entered October 19, 2017. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

[2] The court's four decisions in these cases are identical except for the relief ordered. The plural "Plaintiffs" is used throughout all decisions to refer to Donald P. Danielson, Senda R. Danielson, and David P. Danielson.

[3] Plaintiffs' complaints in the two latter cases did not raise the issue of 2009 gross income. Plaintiffs attempted to put gross income at issue by filing documents captioned "Amended Complaint" in each case after Defendant had filed its answers. Those documents were filed without leave of the court or written consent by Defendant, and did not suffice to amend the complaints. *See* TCR 23 A. However, the court treats the issue as if it had been raised in the pleadings because Defendant submitted evidence and tried the issue without objection. *See* TCR 23 B.

M were received without objection. Defendant's exhibit N was received with objection for demonstrative purposes only.

On December 23, 2016—less than two weeks before trial—Plaintiffs filed motions to compel and motions to set over the trials in TC–MD 160367G and 160368G. Those motions were argued at the outset of trial and the court denied them under the rules of the Magistrate Division in effect in 2016. After the conclusion of trial, the parties submitted post-trial briefs.

## I. STATEMENT OF FACTS

During the years at issue, Plaintiffs Donald P. Danielson and David P. Danielson were respectively 51-percent and 49-percent shareholders in an S corporation, Danielson Contractors, Inc. (DCI). DCI was a heavy construction company, performing primarily excavation and related work: connecting sewer lines, fill house excavating, utility trenching, grading, paving, and hauling gravel. DCI's equipment included track excavators, dump trucks, a road grader, a roller, pickup trucks, and trailers. (Ptfs' Ex 23 at 1859.) DCI was organized in 2001; the twin brothers had previously run another construction company, D. Danielson Construction, Inc., from 1993 to 2001.

David did the bookkeeping for DCI. Donald worked in the field, although David testified that, along with the bookkeeping, he "was trying to do some work out there in order to make myself some revenue." David testified that the brothers tried to work different jobs because they tended to argue when put together on the same job. The brothers lived at different addresses, in different cities. (Def's Ex C at 4–5.) David testified that Sonia Kellas, a personal companion with whom he lived, was also involved with DCI, although not as an employee. David testified that DCI had two employees in 2009 and none during the other years at issue.

/ / /

Both David and Plaintiffs' expert witness testified that David's bookkeeping skills were extremely poor. David testified that he had thought of his accounting software as a tool to generate invoices. He testified that he issued multiple invoices to customers for the same amounts owed, either to correct errors or to reflect statement credits and partial payments received. The sales revenue accounts in DCI's general ledger intermingled entries for amounts invoiced to customers, for deposits, and for sales receipts. Most of the entries were debits—reducing DCI's sales revenue by the amount it invoiced and the amount it deposited. In some cases invoices were credited, often with memoranda reflecting receipt of payment from a customer. David testified that he did not remember what his business income was in 2009.

Plaintiffs' expert testified that DCI's 2009 income was best approximated by adding up the bank deposits made to its account at West Coast Bank that year—a total of $143,336. (Ptfs' Ex 22; Def's Ex H at 4.) Defendant's auditor testified that DCI's 2009 income was best approximated by adding up its invoices that year—a total of $236,692.[4] (*See* Def's Exs A at 1, B at 2.) Both parties agreed that DCI was on cash-basis accounting during the years at issue.

David testified that he did not have a personal bank account during the years at issue. After a serious illness in 2006, a hospital had taken a judgment against him for unpaid medical debt. David ceased using a personal bank account at that time in order to avoid garnishment by that creditor. He paid his personal bills from DCI's checking account. Regarding the possibility of depositing business income into another account, David gave the following testimony.

> "Mr. Kennedy [counsel for Plaintiffs]: Did you at any point in 2009, 2010, 2012, or 2013 deposit checks made payable to Danielson Contractors into another account?

///

---

[4] The invoice total is the amount found by the auditor ($240,913) as reduced by the conference officer ($4,221). The invoices were not submitted into evidence.

"David Danielson [the Witness]: No.

"Counsel: No. Okay. You're absolutely positive?

"The Witness: I'm positive."

"* * * * *

"Counsel: * * * And you testified earlier that during the years in question—2009, 2010, 2012, and 2013—all monies that came into the business were deposited in the corporate checking account, correct?

"The Witness: Yes.

"Counsel: Nothing went into your personal bank account?

"The Witness: No, there was no personal bank account for it to go into.

"Counsel: Okay.  Thank you."

The 2009 DCI bank statements provided by Plaintiffs were from West Coast Bank.  (Ptfs' Ex 1; Def's Ex H.)  The credits on the statements were largely from deposits, although two credits totaling $1,200 were described on the statements as telephone transfers requested by Sonia Kellas.  (Def's Ex H at 5, 9.)  Debits were from both checks and electronic payments, including two debits totaling $1,065 described as telephone transfers "requested by Dave." (Def's Ex H at 10, 26.)  Eighteen checks totaling $30,700 were made out to David Danielson over the course of the year, and one counter check for $500 was made out to "D. Danielson." Two checks totaling $2,200 were made out to "Danielson Contractors," dated March 3, 2009, and August 17, 2009.  (Def's Ex H at 15, 58.)  The checks to "Danielson Contractors" were canceled with a stamp from US Bank National Association that read: "CREDITED TO THE ACCOUNT OF THE WITHIN NAMED PAYEE."

DCI's 2009 general ledger listed only one cash account, labeled "US Bank General Account."  (Def's Ex D at 1.)  Many of the entries in that cash account corresponded to credits

and debits on the West Coast Bank statements.[5] The two checks to Danielson Contractors were described in the ledger as "transfers." (*Id.* at 1, 6.) One of the telephone transfers "requested by Dave" was also described as a transfer in the ledger. (*Id.* at 5.) The other telephone transfers— by Sonia Kellas and by David—were not entered in the ledger. Several deposits reported on the bank statements did not have a corresponding general ledger entry. To take one month as an example, the March 2009 bank statement reported deposits totaling $12,065, but, during the same time period, the cash account in the general ledger reported incoming payments totaling only $6,420. (*See* Def's Exs D at 1–2, H at 13.)

Plaintiffs' expert, who had once run a construction company in addition to his accounting business, testified to an industry practice of withholding "retainage" when paying contractors' invoices. Plaintiffs' expert testified that he determined from examining DCI's books that 10 percent of some invoices had been retained by DCI's customers. Plaintiffs' expert further testified that economic conditions in 2009 were particularly harmful to developers, some of whom found themselves unable to pay on their invoices from contractors.

Additional facts are introduced as relevant in the analysis below.

## II. ANALYSIS

The issues in this case are the determination of DCI's 2009 gross income and DCI's eligibility for additional expense deductions under Internal Revenue Code (IRC) section 162 for tires, tools, insurance, cellular telephone service, postage, T-shirts, a motorhome, a saw, DMV fees, a carport, truck repairs, and a grease gun. As to each issue, Plaintiffs must bear the burden of proof. *See* ORS 305.427.

---

[5] In some cases the amounts did not match. For example, check number 7407, made payable to ODOT/MCT, was drawn in the amount of $308.63, but only a $241.63 credit was applied against the cash account in the ledger. (Def's Exs H at 44; D at 2.)

A.      *2009 Gross Income*

Taxpayers in Oregon must follow the record keeping and reporting requirements of section 6001 of the IRC.  *Brenner v. Dept. of Rev.*, 9 OTR 299, 305–06 (1983).  IRC section 6001 requires taxpayers to "keep such records, render such statements, make such returns, and comply with such rules and regulations as the Secretary may from time to time prescribe."  Taxpayers therefore must keep "such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information."  26 CFR § 1.6001–1(a).

Where a taxpayer's books do not clearly reflect income, the Department of Revenue may demonstrate unreported income "by any practicable proof that is available in the circumstances of the particular situation."  *Brenner*, 9 OTR at 306 (quoting *2 Mertens Law of Federal Income Taxation* § 12.12); *cf. U.S. v. Doyle*, 234 F2d 788, 793 (7th Cir 1956).

One indirect method of determining income that the Department of Revenue may employ involves the analysis of a taxpayer's bank deposits.  *See Brenner*, 9 OTR at 302 n 2; *Doyle*, 234 F2d at 793.  Bank deposit analysis involves inferring that deposits into a taxpayer's bank account represent income.  *Doyle*, 234 F2d at 793.  It does not follow that a taxpayer's income is limited to what is deposited in the bank account.  Plaintiffs' expert testified that it was appropriate to determine income not only by totaling up bank deposits, but also by looking at whether a taxpayer had other bank accounts, whether there was evidence that a taxpayer was hiding money, and whether a taxpayer's wealth had grown over a given time period.

In this case, Plaintiffs' own expert admitted that DCI's 2009 general ledger contained errors and that its stated income was unreliable.  He stated that the best approximation of DCI's 2009 income would come from a bank deposit analysis.  All parties agree that the 2009 deposits

into DCI's West Coast Bank account were income. The parties differ as to whether DCI had additional income beyond those deposits.

David's testimony that all checks made out to Danielson Contractors were deposited into DCI's account suggested that DCI had only one account. However, the two checks made out to DCI and deposited at U.S. Bank are convincing evidence that DCI had another account for which bank statements were not provided. Additional support for that conclusion comes from the transfers in and out of the West Coast Bank account by David and Ms. Kellas, and from the mention of U.S. Bank in the title of the general ledger's cash account. Because Plaintiffs only provided the West Coast Bank statements, it is impossible to be confident that the deposits shown on those statements amount to DCI's entire 2009 income.

Furthermore, no evidence was provided of how Donald lived during 2009. David paid his mortgage and other personal bills from the West Coast Bank account, and withdrew over $30,000 in cash as well. But no checks were made out to Donald Danielson (one $500 check was made payable to "D. Danielson"). Donald and David lived in different cities, and David's testimony was that the brothers avoided getting too close to one another. On that evidence, it is unlikely that David paid Donald's mortgage or otherwise handled his personal finances. It is more likely that Donald received income that went into another account or was held in cash. David's comment that working in the field was a way to earn additional income for himself suggests the possibility that those who did field work for DCI had an additional revenue source.

Given DCI's unreliable ledger, the lack of explanation as to how Donald lived, and the direct evidence of an undisclosed account at U.S. Bank, Plaintiffs have not met their burden to show that DCI's 2009 income was limited to the deposits into the West Coast Bank account.

/ / /

Defendant adjusted DCI's 2009 income to equal the total of the amounts DCI invoiced in 2009. Plaintiffs argued that, in doing so, Defendant had switched DCI's accounting from cash to accrual basis. Defendant's auditor testified otherwise, stating that the adjustment was a best estimate based on the most complete set of documents available.

The evidence does not support Plaintiffs' charge that Defendant switched its accounting method. Given the poor state of DCI's books, it is clear that some estimate of DCI's 2009 income was necessary. Plaintiffs would prefer an estimate using bank deposit analysis, but they did not provide bank statements for DCI's account at U.S. Bank and they did not explain how Donald paid his living expenses during the years at issue. Defendant acted reasonably in looking to Plaintiffs' invoices for additional evidence of income.

Defendant's method of estimating DCI's 2009 income from its invoices is not entirely satisfactory. As noted at trial, some invoices of DCI's might not have been fully paid. Some invoices might have issued multiple times with a running balance. And a few amounts invoiced near the end of 2009 were double-counted in 2010, when payment was received.

Nevertheless, the uncertainties in Defendant's estimation are attributable to Plaintiffs' lack of records. If Plaintiffs' books and documents were in order, no estimation would be necessary. If Plaintiffs had provided complete bank account and living expense information, a bank deposit analysis could have yielded a more accurate estimate. While the double-counting of some invoices at the end of 2009 is concerning, Plaintiffs did not show that Defendant reasoning—that such expenses roughly approximated unknown invoices at the end of 2008— was unsound. The bank statements provided show the least amount of income DCI might have earned in 2009. Given evidence of an undisclosed bank account, DCI may have earned

/ / /

additional income even beyond what was shown on the invoices. Plaintiffs' evidence does not support ordering a further adjustment to DCI's 2009 income.

B.      *Expense Deductions*

Taxpayers may deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]" IRC § 162(a). Defendant allowed deductions to Plaintiffs for each of the years at issue. Plaintiffs submitted evidence of additional expenses, including bank statements with canceled checks; invoices and statements from Les Schwab, Snap-on Tools, and Sprint; and insurance policies.

1.      *Tires and Tools*

a.      Payments on credit

Plaintiffs and DCI made purchases from Les Schwab and Snap-on Tools on credit. Cash-basis taxpayers generally must claim deductions "for the taxable year in which paid." 26 CFR § 1.461−1(a)(1). Where an expense is incurred for an item purchased on credit, the question arises when that expense is "paid" because an item that is bought on credit in one year may be paid for in another year.

The time that such an expense is paid depends on whether credit is extended to the taxpayer by the vendor or by a third party. A taxpayer that pays an expense using money borrowed from a third party has paid at the time of purchase and generally must claim any deduction in that year. *Granan v. Commissioner*, 55 TC 753, 755 (1971). However, a taxpayer that gives a promissory note in exchange for a good or service has only promised to pay, and so no deduction is allowed until payment is actually made on the note. *See Eckert v. Burnet*, 283 US 140, 51 S Ct 373, 75 L Ed 911 (1931); Rev Rul 77-257, 1977-2 CB 174.

/ / /

Here, the evidence shows that the consideration for the purchases from Snap-on Tools and Les Schwab were promises to pay the dealers rather than immediate payments with borrowed money. The Snap-on Tools purchases through June 2008 were financed (or refinanced) with a "Credit Sale Contract" between Donald Danielson and the dealer. (Ptfs' Ex 5 at 186–88.) By the terms of the contract, Donald promised to pay the dealer or the dealer's assignee according to a payment schedule. (*Id*. at 187.) An additional page after the signature blocks was not provided, but text printed below the signature blocks, if ratified by the dealer on the subsequent page, would have assigned the contract to Snap-on Credit LLC. (*Id*. at 188.) Such an assignment would not change the character of the purchase as a promise to pay. The evidence shows that the purchases from Les Schwab were made on account: Les Schwab issued invoices, and Les Schwab maintained a ledger of DCI's payments and charges. Because Plaintiffs' purchases from both Snap-On and Les Schwab were financed by the vendor, any deductions for such expenses would be claimed at the time of payment rather than the time of purchase.

b.       Les Schwab

Plaintiffs and DCI made payments on purchases of tires, batteries, and services from Les Schwab during the years at issue. David testified that some of those purchases were personal; on direct examination, he estimated the total amount of personal expenses at $600 every year or two to put tires on an Expedition. That estimate appears low. On cross-examination, David admitted that purchases for a Mustang were also personal. Purchases for the Mustang from Les Schwab exceeded $4,000 in April 2008 alone. (Ptfs' Ex 7 at 238–39, 261.)) David testified that tires for the heavy equipment and trailers wore out quickly and did not last more than a year.

/ / /

Tires may only be deducted as expenses if they are consumable within a year of purchase. *Interstate Truck Serv., Inc. v. Commissioner.*, 17 TCM (CCH) 1079 (1958). If they are not consumable within a year, they must be capitalized and depreciated. *Id*. The court accepts David's testimony that tires for DCI's heavy equipment and trailers were consumable within a year, and therefore that an expense deduction rather than a depreciation deduction would be appropriate for any allowable tire expenses.

Expenses with respect to passenger automobiles are subject to the strict substantiation rules of IRC section 274(d). *See* IRC §§ 274(d)(4); 280F(d)(4), (5). Those requirements include not only records of the amount of the expense, but also of the time, place, and business purpose of the use of the vehicle. *See* IRC § 274(d). Passenger automobiles include lightweight vehicles designed for use on public roads. *See* IRC § 280F(d)(5). Pickup trucks are subject to strict substantiation unless they have been specially modified such that they are unlikely to be used more than a *de minimus* amount for personal reasons. 26 CFR 1.274–5(k)(7). "Qualified nonpersonal use vehicles"—including dump trucks—are excepted from strict substantiation requirements. IRC § 280F(d)(5); 26 CFR § 1.274–5(k)(2)(ii)(I).

Here, the vehicles for which DCI made purchases at Les Schwab included both "qualified nonpersonal use vehicles" and passenger automobiles. In the former category were the heavy construction equipment and two dump trucks. In the latter category were two F350 pickup trucks not shown to be specially modified, an Expedition, and a Mustang (which David testified was used solely for personal reasons). Receipts indicated purchases for additional passenger automobiles—about which no testimony was received—including a Nissan Sentra and an F150 pickup. (Ptfs' Ex 7 at 263–64.) Additionally, DCI made purchases from Les Schwab for its equipment trailers.

Plaintiffs did not submit documentary evidence showing the time, place, or business purpose of the use of any of the vehicles for which they made purchases at Les Schwab. Therefore, no deduction may be allowed for the expenses of the pickup trucks, the Expedition, or any of the passenger cars. *See* IRC § 274(d). While the court is satisfied from David's testimony that the trailers, dump trucks, and heavy construction equipment were used for business purposes, it must have a reasonable basis for determining the amount of deductible business expense incurred at Les Schwab. *See Vanicek v. C.I.R.*, 85 TC 731, 742–43 (1985).

Plaintiffs requested that DCI be allowed an additional deduction of $5,750 in 2009 for its payments to Les Schwab, and the evidence establishes those payments were made. Because DCI's account with Les Schwab had a balance of $8,727.87 at the beginning of 2009, all of the 2009 payments were applied to purchases made in previous years. (*See* Ptfs' Ex 8 at 292.) Plaintiffs submitted evidence of expenditures in previous years, including printouts from Les Schwab of account activity, some statements, and some invoices. However, Plaintiffs' records of 2008 are incomplete. The 2008 printout of account activity extended only until May. (Ptfs' Ex 7 at 239.) Statements were provided for some additional months, but not all, and the statements did not contain descriptions of the charges. Some invoices were also provided, although not for all expenses. Given the gap in the 2008 records, the court does not have sufficient evidence to estimate what proportion of the balance carried forward into 2009 was for deductible business expenses—as opposed to both inadequately substantiated passenger automobile expenses and personal expenses. No additional deductions for Les Schwab expenses are allowed for 2009.

For 2010, Plaintiffs requested an additional $5,000 deduction and submitted evidence of payments. At the beginning of 2010, DCI's account at Les Schwab had a balance of $5,162.38.

(Ptfs' Ex 8 at 321.) The first $2,977.87 of those payments cover the remainder of the balance carried forward from 2008, and a deduction for that amount is denied for the same reason a deduction for the 2009 payments is denied. The remainder of the $5,000 paid in 2010 covered the first $2,022.13 of charges incurred in 2009—a period extending through November. (See Ptfs' Ex 8 at 290.) Over $1,200 of those charges were finance charges for pre-2009 debt. Deductions for those finance charges are disallowed because the gap in 2008 records prevents the court from determining what proportion of the financing was for business expenses. Of the remainder of the 2009 charges through November, only one was associated with an invoice showing it was for a business vehicle—an equipment trailer. (Ptfs' Ex 8 at 303–04.) A deduction for that expense of $599.06 is allowed for the 2010 tax year.

The 2011 tax year is not at issue and no records of Les Schwab charges or payments were provided for that year.

For 2012, Plaintiffs requested an additional deduction of $2,318.75 and submitted evidence of payments largely consisting of debits from DCI's bank account. Plaintiffs did not submit evidence of DCI's balance with Les Schwab carried forward into 2012. Without such records, or records of the prior year's account activity, the court cannot determine what portion of DCI's 2012 payments were for deductible business expenses. No deduction for Les Schwab payments is allowed for 2012.

For 2013, Plaintiffs requested an additional deduction of $774 and submitted evidence of payments. DCI's initial balance with Les Schwab in 2013 was $1,901.36. DCI's 2013 payments are therefore applicable to a prior year's debt. Lacking full information about charges and payments in 2011 and 2012, the court cannot determine whether any of that $774 was payment for a deductible business expense. No deduction for Les Schwab payments is allowed for 2013.

c.      Snap-on Tools

David testified that Snap-on Tools is a supplier of high-quality tools and related accessories. Donald had signed a "credit sale contract" with a Snap-on dealer on June 24, 2008. (Ptfs' Ex 5 at 186, 229.) The occasion of the June 2008 credit sale contract was the purchase of a rolling tool cabinet for $1,935.40. (*Id*. at 186, 191.) That amount was added to a prior unpaid balance of $4,889.47, and a hefty finance charge was applied to reach a total "credit sale price" of $11,294.40. Donald was obligated by the contract to make weekly payments on that amount for the next five years. A collection letter, dated August 8, 2014, showed an account balance of $2,021.41. (*Id.* at 229.)

Plaintiffs have requested an additional deduction for payments to Snap-on totaling $7,151 during the years at issue. With the exception of a small cash purchase for unknown items on July 15, 2013 (Ptfs' Exs 4 at 166, 5 at 198), there is no evidence that DCI's payments to Snap-on were anything other than payments on the June 2008 credit sale contract. The total payments alleged by Plaintiffs amount to about 63 percent of the original credit sale price. Because over 70 percent of the amount financed in the credit sale contract was a prior unpaid balance, the sum of all the payments to Snap-on over the years at issue must be apportioned to that prior balance, before the purchase of the rolling tool cabinet.

The evidence suggests that a portion of the pre-2008 balance was either for personal use or for another business. The only sales and credit documentation provided from that period was for purchases in 1998, 1999, and 2002. Because the first two purchases were made before DCI's incorporation in 2001, they could not have initially been for DCI's use. Presuming that the tools were later transferred to DCI's use, no estimate of their value at the time of the transfer was submitted. However, the evidence shows that the tools were used for personal purposes at least

some of the time. David testified that he kept the tools in his truck and borrowed them as needed at home. Given that Plaintiffs' evidence showed that the two brothers shared an interest in collectible cars, there is ground for supposing the tool expenses were incurred at least partially for personal reasons.

The documentation in the record does not suffice for the court to quantify what portion, if any, of Donald's pre-2008 balance was incurred for purposes of DCI's business. No statements from Snap-on were provided for periods before 2008. Donald's ability to obtain credit from Snap-on in 2008 suggests that he had made payments on his prior purchases in the intervening years, but no documentation of those payments was provided. According to David's testimony, at least one additional purchase was made during that time—a welder described in a printout from Snap-on's web site. That printout was dated in 2013, five years after the credit sale contract. It does not show when the welder was purchased or how much was paid. Without clearer documentation—such as statements from Snap-on for the period before June 2008—the court does not have a "basis on which an estimate may be made." Vanicek, 85 TC at 743. No deduction for payments to Snap-on is allowed for any of the years at issue.

2. Insurance

DCI made payments on multiple insurance policies during the years at issue. David described DCI's business as particularly reliant on insurance and on bonds. Deductions for a portion of DCI's claimed insurance expenses were allowed at audit and at conference. Plaintiffs request additional deductions, as summarized in the following table.

///

///

///

| | | *Requested* |
| Tax year | *Allowed at* *Audit* | *Additional* *Deduction* |
|---|---|---|
| 2009 | $15,995 | $4,097 |
| 2010 | $16,350 | $904 |
| 2012 | $7,462 | $5,410 |
| 2013 | $3,713 | $3,556 |

(Def's Ex A at 6, 12, 18, 24; Ex B at 2–3.) Plaintiffs provided policies for some, but not all, of the payments they made. Because some expenses were previously allowed at audit, a threshold question for each year will be whether Plaintiffs have shown that Defendant did not already allow a deduction for the particular payment claimed.

For 2009 and 2010, Defendant's auditor's report did not specify which insurance policies were allowed. The conference decision also did not itemize which policies were allowed, but did state that payments on policies with American Modern Select and Safeco were disallowed. Plaintiffs provided canceled checks made out to five payees in 2009 and 2010: Liberty Northwest, C.A. Tomassene & Son, Mid Valley GA, Ross & Associates, and Safeco. Evidence suggests that C.A. Tomassene & Son was an agent for multiple companies, including Liberty Northwest and North Pacific Insurance, and also issued bonds. (Ptfs' Exs 19 at 1305–06, 20 at 1307–09, 1322, 1380.) Ross & Associates was an agent for companies including American Hallmark, Safeco, SAIF Corporation, and American Modern Select. (Ptfs' Ex 20 at 1312, 1608–09, 1639.) Mid Valley General Agency was an agent for Scottsdale Insurance Company. (Ptfs' Ex 20 at 1406.)

There is no evidence that the 2009 and 2010 payments to Liberty Northwest, C.A. Tomassene & Son, and Mid Valley General Agency were disallowed by Defendant, and so Plaintiffs have not proved they are entitled to an additional deduction for those payments.

/ / /

Because the conference officer disallowed payments to American Modern Select and Safeco, there is some evidence that payments to Ross & Associates were not allowed at audit.

Plaintiffs did not provide the Safeco and American Modern Select policies. A cancellation notice from American Modern Select was addressed to David Danielson and Sonia Kellas—not DCI—and identified that policy as a mobile home policy for property in Detroit. (Ptfs' Ex 20 at 1639.) Plaintiffs presented no evidence of the business purpose of that policy. A billing statement from Safeco was also addressed to David Danielson and Sonia Kellas—not DCI—and was identified as an umbrella policy. (Ptfs' Ex 20 at 1608.) On the evidence, it is more likely than not that those policies were for personal use. Because Plaintiffs did not show a business purpose for the payments to Ross & Associates, and because they did not show that their other insurance payments went beyond what was allowed at audit, no additional deduction is allowed for 2009 or 2010.

For 2012, Defendant's auditor's report itemized the insurance payments allowed: Five payments each to Capital Premium Insurance and American Hallmark, one payment to Pac West of $601.42, and one payment to HCC. (Def's Ex A at 18.) Plaintiffs requested additional deductions for documented insurance payments to two companies, Hagerty and Zurich. (Ptfs' Ex 27 at 2.) The payment to Zurich was in the amount of $804.83. (Ptfs' Ex 3 at 89.) The Hagerty policy was not provided and the court cannot verify its business purpose. The Zurich policy was. (Ptfs' Ex 18 at 1033.) The agent for the Zurich policy was PacWest Insurance. (*Id.* at 1043.) The named insured was SJ Contracting Inc. (*Id.*) An additional named insured was DCI. (*Id.* at 1044.) That policy covered business automobiles, and the schedule of covered automobiles included F350s, construction vehicles, and trailers such as used by DCI. (*Id.* at 1060–61.) The payment already allowed to PacWest was by check posted on July 13, 2012.

(Ptfs' Ex 3 at 110.)  The additional payment claimed by Plaintiffs was debited on December 3, 2012.  (*Id.* at 89.)  The court finds that the payment to Zurich was a business expense and was not a duplicate of the payment to PacWest already allowed by Defendant.  The court allows DCI an additional deduction of $804.83 for 2012.

For 2013, the auditor's report itemized allowed insurance payments to Capital Premium Insurance, NCCI, and Financial Pacific.  (Def's Ex A at 24.)  Plaintiffs requested additional deductions for payments to Zurich, PacWest, and United Fire & Casualty.  (Ptfs' Ex 28 at 1.)  Plaintiffs' bank statements show an $804.83 payment to Zurich, a $200.00 payment to PacWest, and three payments totaling $2,552.00 to United Fire & Casualty.  (Ptfs' Ex 4 at 147, 159, 175, 180, 182.)  Deductions for payments to Zurich and PacWest are allowed as in prior years.  The account number associated with the direct deposit payments to United Fire & Casualty on Plaintiffs' bank statements was identical with the account number of Plaintiffs' commercial auto policy with Financial Pacific Insurance Company, which is a member of the United Fire Group.  (*Compare* Ptfs' Exs 4 at 175, 19 at 1263.)  The court finds that the payments to United Fire & Casualty were ordinary and necessary business expenses.  An additional deduction of $3,556.83 is allowed for 2013.

3.      Cellular Telephone

DCI made payments to Sprint for cellular telephone service during the years at issue. David testified that cell phones were used for communication over the sound of heavy machinery while on job sites.  David testified that he did not have personal telephone service.  When asked to estimate the proportion of business to personal use of his cell phone, he stated that he and his brother had "no life" and that any personal use was a very small portion.  DCI's plan with Sprint included a second cell phone in Ms. Kellas's name, which was active in 2012 and 2013.  In their

post-trial brief, Plaintiffs stated that Ms. Kellas's cell phone was for personal use. Plaintiffs' documentation of DCI's cell phone expenses includes invoices from Sprint covering most of the years at issue, and some bank statements.

In general, if property is held and used for "profit-motivated purposes," then expenses related to that property are deductible; whereas, property held for personal reasons will not give rise to a deduction. *Deihl v. Commissioner*, 90 T.C.M. (CCH) 579, WL 3446081 at \*10 (2005). "If substantial business and personal motives exist," the court may allocate expenses between personal and business use. *Id.*

In 2009, cellular telephones were "listed property" under IRC section 280F(d)(4), meaning that a deduction was only allowed if a taxpayer satisfied the substantiation requirements of IRC section 274(d). Plaintiffs here concede that their documentation does not meet that standard and that they are not entitled to a deduction for cell phone expenses in 2009.

As of 2010, cellular telephones were removed from the definition of "listed property." *See* Pub L 111-240, § 2043, 124 Stat 2560 (2010). As a consequence, it is possible for courts to estimate the amount of allowable deductions pursuant to the rule in *Cohan v. Commissioner*, 39 F2d 540 (2d Cir 1930). Such estimation is only possible if there is a basis in the record from which a court can reasonably apportion business and personal use. *Vanicek*, 85 TC at 742–43.

David's testimony demonstrated that there were substantial business reasons for using cell phones while on the job. However, David had no other personal telephone service, and the cell phone plan also included a purely personal line for Ms. Kellas. Those facts suggest that there were personal motives for having the cell phone as well. Moreover, because a personal telephone line is generally essential to conducting one's affairs, David's testimony that he used his cell phone almost entirely for business purposes requires additional support that was not

provided. The invoices show that David commonly placed and received hundreds of calls each month. Anyone's recollection after a period of four to seven years is liable to error, particularly with respect to numerous small activities. As an example, David did not initially recall the $4,000 purchase for his Mustang when he testified about personal purchases at Les Schwab.

In their brief, Plaintiffs proposed that the court allocate business and personal expenses based either on number of calls or number of minutes. Either method could be appropriate, if the court could distinguish which calls and which minutes were personal. The evidence does not allow that determination.

Given the cyclical nature of DCI's business, the court considered whether a baseline of personal use could be determined by looking at David's usage patterns during the winter, when he testified that DCI's business dropped off. However, no pattern of escalating usage occurred in the summer; in fact, the billing statements showed the contrary. David used fewer cell phone minutes in the summer months than he did in the winter. While that evidence is not conclusive that David's cell phone usage was primarily personal, it does not aid the court in apportioning between business and personal use.

Because there is no basis in the record for distinguishing personal from business use of the cell phone, any relief for Plaintiffs would be "unguided largesse." *Williams v. United States*, 245 F2d 559, 560 (5th Cir 1957). No additional deduction for cell phone expenses is allowed for any of the years at issue.

4.      Postage

David testified that DCI used postage for sending invoices and other business correspondence. Plaintiffs provided a canceled check made payable to the postmaster in the amount of $36.50. (Ptfs' Ex 2 at 64.) The parties agreed that invoices were sent to DCI's

customers. The court finds that postage was an ordinary and necessary business expense and allows an additional deduction of $36.50 in 2010.

5.    T-shirts

David testified that DCI purchased T-shirts printed with the company logo from Café Press in 2010, to be worn while working at job sites. Because DCI did not have employees in that year, the T-shirts were presumably to be worn by David and Donald. Plaintiffs requested a deduction for the T-shirts on the ground that they were uniforms.

A deduction for the expense of work clothes is only allowed if the clothes are specifically required as a condition of employment and not adaptable to general usage as ordinary clothing. *Donnelly v. Commissioner*, 262 F2d 411, 412 (2d Cir 1959); Rev Rul 70-474, 1970-2 CB 34. Because employment is the "trade or business" of an employee, for self-employed workers the first prong of the test may be stated as requiring that the clothing be specifically required by the trade or business—the way that uniforms are specifically required for police officers and nurses. *Cf*. Rev Rul 70-474, 1970-2 CB 34.

Here, the evidence does not show that a T-shirt with a logo was specifically required to work in construction. Although DCI may have derived some benefit from having its logo worn on job sites, David and Donald also derived benefit from being provided with clothing. Clothing expenses are not deductible unless wearing the clothes is required. Defendant correctly disallowed a deduction for uniform expenses.

6.    Motorhome

David testified that he had purchased a motorhome for personal use in 1995. DCI made payments on that motorhome to Bank of America. During 2009, DCI used the motorhome to temporarily house two employees near job sites.

For 2010, Plaintiffs requested a deduction of $1,655.55 related to the motorhome, and the evidence contains canceled checks showing payments to Bank of America in that amount. (Ptfs' Ex 2 at 41, 49–50; Def's Ex I at 18.) Plaintiffs' theory for claiming that deduction was that DCI was paying rent for the use of the motorhome.

The evidence does not support Plaintiffs' claim to a motorhome-related deduction. The evidence does not show that DCI used the motorhome during 2010, raising the question of the business purpose of DCI renting it that year. Additionally, there is no evidence of the market rent for a motorhome in 2010; Plaintiffs offered only vague testimony of the going rate in the late 1990s. The request for a deduction in the amount of payments to Bank of America might suggest a deduction under IRC section 162. However, unlike the payments to Les Schwab and Snap-on above, payments on a third party loan to finance a purchase are not deductible under IRC section 162. Plaintiffs did not provide a depreciation schedule or other information sufficient to establish any entitlement to a deduction under IRC section 167. Plaintiffs have not borne the burden of proof with respect to a deduction for the motorhome.

7.      Truck Repairs

Plaintiffs' bank statements showed $337.74 in payments to Papé. David testified that Papé dealt exclusively in equipment for heavy trucks. While memory of long-past transactions is unreliable, the court places more credence in David's knowledge of this vendor's line of business. On the balance, it is more likely than not that the purchases from Papé were for DCI's business purposes. An additional deduction of $337.74 for truck repair is allowed in 2012.

8.      DMV Fees

Plaintiffs provided canceled checks showing $489.50 in payments to the DMV in 2010. David testified that he was able to recognize the purpose of the payments from the amounts of

the checks. However, the evidence shows that Plaintiffs used multiple personal vehicles—some of which David did not recall during his testimony. Payments to the DMV could be for any of them, or for a driver's license renewal. Without more evidence, Plaintiffs have not borne their burden to show the DMV fees were incurred for business purposes.

9.     Carport

Plaintiffs submitted a canceled check made out to TriState Carports in the amount of $1,256. (Ptfs' Ex 3 at 91.) David testified the purchase was of a carport to cover DCI's heavy equipment in the rain. David's testimony on this point was credible and the court allows an additional deduction of $1,256 in 2012.

10.     Saw

An electronic payment of $30.40 to Woodstock appears on one bank statement. (Ptfs' Ex 2 at 47.) David testified that the payment was for a steel cutoff saw used in DCI's business. David's testimony offered seven years after a minor purchase is entitled to little weight. Without further documentation of the sale—such as a receipt—Plaintiffs have not borne their burden of proof.

11.     Tacoma Screw

One bank statement showed a payment of $65.66 to Tacoma Screw in 2012. David testified that Tacoma Screw was a fastener company that he only visited for one purpose: to obtain a specialty grease gun for applying oil to rusty threads on DCI's heavy equipment. David's testimony was credible, and the court allows an additional deduction of $65.66 for tax year 2012.

/ / /

/ / /

### III. CONCLUSION

Because DCI's ledger was unreliable and because Plaintiffs did not provide complete bank records, they have not borne their burden to reduce their 2009 gross income. Plaintiffs' evidence showed that DCI was entitled to some additional deductions under IRC section 162 in 2010, 2012, and 2013. Now, therefore,

IT IS THE DECISION OF THIS COURT that, for tax year 2012, Danielson Construction, Inc. is allowed an additional deduction of $2,464.23.

IT IS FURTHER DECIDED that, for tax year 2013, Danielson Construction, Inc. is allowed an additional deduction of $3,556.83.

Dated this ____ day of November, 2017.

POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Davis and entered on November 7, 2017.*