COMMISSIONER OF INTERNAL REVENUE *v.*
FINK ET AL.

No. 86–511.   Argued April 27, 1987—Decided June 22, 1987

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, and O'CONNOR, JJ., joined. WHITE, J., filed a concurring opinion, *post*, p. 100. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 100. BLACKMUN, J., concurred in the result. STEVENS, J., filed a dissenting opinion, *post*, p. 101.

*Alan I. Horowitz* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Olsen, Deputy Solicitor General Lauber,* and *Jonathan S. Cohen.*

*Matthew J. Zinn* argued the cause for respondents. With him on the brief were *Susan H. Serling, J. Walker Johnson, W. Merritt Jones, Jr.,* and *Mark K. Wilson.*\*

JUSTICE POWELL delivered the opinion of the Court.

The question in this case is whether a dominant shareholder who voluntarily surrenders a portion of his shares to the corporation, but retains control, may immediately deduct from taxable income his basis in the surrendered shares.

I

Respondents Peter and Karla Fink were the principal shareholders of Travco Corporation, a Michigan manufacturer of motor homes. Travco had one class of common stock outstanding and no preferred stock. Mr. Fink owned 52.2 percent, and Mrs. Fink 20.3 percent, of the outstanding

---

\**Patrick J. Carr* filed a brief for Leroy Frantz, Jr., as *amicus curiae.*

shares.[1]  Travco urgently needed new capital as a result of financial difficulties it encountered in the mid-1970's.   The Finks voluntarily surrendered some of their shares to Travco in an effort to "increase the attractiveness of the corporation to outside investors."   Brief for Respondents 3.   Mr. Fink surrendered 116,146 shares in December 1976; Mrs. Fink surrendered 80,000 shares in January 1977.   As a result, the Finks' combined percentage ownership of Travco was reduced from 72.5 percent to 68.5 percent.   The Finks received no consideration for the surrendered shares, and no other shareholder surrendered any stock.   The effort to attract new investors was unsuccessful, and the corporation eventually was liquidated.

On their 1976 and 1977 joint federal income tax returns, the Finks claimed ordinary loss deductions totaling $389,040, the full amount of their adjusted basis in the surrendered shares.[2]  The Commissioner of Internal Revenue disallowed the deductions.   He concluded that the stock surrendered was a contribution to the corporation's capital.   Accordingly, the Commissioner determined that the surrender resulted in no immediate tax consequences, and that the Finks' basis in the surrendered shares should be added to the basis of their remaining shares of Travco stock.

In an unpublished opinion, the Tax Court sustained the Commissioner's determination for the reasons stated in *Frantz* v. *Commissioner*, 83 T. C. 162, 174–182 (1984), aff'd, 784 F. 2d 119 (CA2 1986), cert. pending, No. 86–11.   In *Frantz* the Tax Court held that a stockholder's non pro rata surrender of shares to the corporation does not produce an

---

[1] In addition, Mr. Fink's sister owned 10 percent of the stock, his brother-in-law owned 4.1 percent, and his mother owned 2.2 percent. App. to Pet. for Cert. 30a.

[2] The unadjusted basis of shares is their cost.   26 U. S. C. § 1012.   Adjustments to basis are made for, among other things, "expenditures, receipts, losses, or other items, properly chargeable to capital account." § 1016(a)(1).

immediate loss. The court reasoned that "[t]his conclusion . . . necessarily follows from a recognition of the purpose of the transfer, that is, to bolster the financial position of [the corporation] and, hence, to protect and make more valuable [the stockholder's] retained shares." 83 T. C., at 181. Because the purpose of the shareholder's surrender is "to decrease or avoid a loss on his overall investment," the Tax Court in *Frantz* was "unable to conclude that [he] sustained a loss at the time of the transaction." *Ibid.* "Whether [the shareholder] would sustain a loss, and if so, the amount thereof, could only be determined when he subsequently disposed of the stock that the surrender was intended to protect and make more valuable." *Ibid.* The Tax Court recognized that it had sustained the taxpayer's position in a series of prior cases.[3] *Id.*, at 174–175. But it concluded that these

---

[3] *E. g., Tilford* v. *Commissioner*, 75 T. C. 134 (1980), rev'd, 705 F. 2d 828 (CA6), cert. denied, 464 U. S. 992 (1983); *Smith* v. *Commissioner*, 66 T. C. 622, 648 (1976), rev'd *sub nom. Schleppy* v. *Commissioner*, 601 F. 2d 196 (CA5 1979); *Downer* v. *Commissioner*, 48 T. C. 86, 91 (1967); *Estate of Foster* v. *Commissioner*, 9 T. C. 930, 934 (1947); *Miller* v. *Commissioner*, 45 B. T. A. 292, 299 (1941); *Budd International Corp.* v. *Commissioner*, 45 B. T. A. 737, 755–756 (1941). The Commissioner acquiesced in *Miller* and *Budd*, but later withdrew his acquiescence. See 1941–2 Cum. Bull. 9; 1942–2 Cum. Bull. 3; 1977–1 Cum. Bull. 2.

The dissent overstates the extent to which the Commissioner's disallowance of ordinary loss deductions is contrary to the "settled construction of law." *Post*, at 105. In fact, the Commissioner's position was uncertain when the Finks surrendered their shares in 1976 and 1977. Although the Commissioner had acquiesced in the Tax Court's holdings that non pro rata surrenders give rise to ordinary losses, "it often took a contrary position in litigation." Note, *Frantz or Fink:* Unitary or Fractional View for Non-Prorata Stock Surrenders, 48 U. Pitt. L. Rev. 905, 908 (1987). See, *e. g., Smith* v. *Commissioner, supra*, at 647–650; *Duell* v. *Commissioner*, 19 TCM 1381 (1960). In 1969, moreover, the Commissioner clearly took the position that a non pro rata surrender by a majority shareholder is a contribution to capital that does not result in an immediate loss. Rev. Rul. 69–368, 1969–2 Cum. Bull. 27. Thus, the Finks, unlike the taxpayer in *Dickman* v. *Commissioner*, 465 U. S. 330 (1984), knew or should have known that their ordinary loss deductions might not be allowed. For this

decisions were incorrect, in part because they "encourage[d] a conversion of eventual capital losses into immediate ordinary losses." *Id.*, at 182.[4]

In this case, a divided panel of the Court of Appeals for the Sixth Circuit reversed the Tax Court. 789 F. 2d 427 (1986). The court concluded that the proper tax treatment of this type of stock surrender turns on the choice between "unitary" and "fragmented" views of stock ownership. Under the "fragmented view," "each share of stock is considered a separate investment," and gain or loss is computed separately on the sale or other disposition of each share. *Id.*, at 429. According to the "unitary view," "the 'stockholder's entire investment is viewed as a single indivisible property unit,'" *ibid.* (citation omitted), and a sale or disposition of some of the stockholder's shares only produces "an ascertainable gain or loss when the stockholder has disposed of his remaining shares." *Id.*, at 432. The court observed that both it and the Tax Court generally had adhered to the fragmented view, and concluded that "the facts of the instant case [do not] present sufficient justification for abandoning" it. *Id.*, at 431. It therefore held that the Finks were entitled to deduct their basis in the surrendered shares immediately as an ordinary loss, except to the extent that the surrender had increased the value of their remaining shares. The Court of Appeals remanded the case to the Tax Court for a determination of the increase, if any, in the value of the Finks' remaining shares that was attributable to the surrender.

Judge Joiner dissented. Because the taxpayers' "sole motivation in disposing of certain shares is to benefit the other shares they hold[,] . . . [v]iewing the surrender of each

---

reason, the Commissioner's disallowance of the Finks' deductions was not an abuse of discretion.

[4] The Court of Appeals for the Second Circuit affirmed the Tax Court's holding and agreed with its reasoning. *Frantz* v. *Commissioner*, 784 F. 2d 119, 123–126 (1986), cert. pending, No. 86–11.

share as the termination of an individual investment ignores the very reason for the surrender." *Id.*, at 435. He concluded: "Particularly in cases such as this, where the diminution in the shareholder's corporate control and equity interest is so minute as to be illusory, the stock surrender should be regarded as a contribution to capital." *Ibid.*

We granted certiorari to resolve a conflict among the Circuits,[5] 479 U. S. 960 (1986), and now reverse.

## II

### A

It is settled that a shareholder's voluntary contribution to the capital of the corporation has no immediate tax consequences. 26 U. S. C. § 263; 26 CFR § 1.263(a)–2(f) (1986). Instead, the shareholder is entitled to increase the basis of his shares by the amount of his basis in the property transferred to the corporation. See 26 U. S. C. § 1016(a)(1). When the shareholder later disposes of his shares, his contribution is reflected as a smaller taxable gain or a larger deductible loss. This rule applies not only to transfers of cash or tangible property, but also to a shareholder's forgiveness of a debt owed to him by the corporation. 26 CFR § 1.61–12(a) (1986). Such transfers are treated as contributions to capital even if the other shareholders make proportionately smaller contributions, or no contribution at all. See, *e. g.*, *Sackstein* v. *Commissioner*, 14 T. C. 566, 569 (1950). The rules governing contributions to capital reflect the general principle that a shareholder may not claim an immediate loss for outlays made to benefit the corporation. *Deputy* v. *Du Pont*, 308 U. S. 488 (1940); *Eskimo Pie Corp.* v. *Commissioner*, 4 T. C. 669, 676 (1945), aff'd, 153 F. 2d 301 (CA3 1946). We must decide whether this principle also applies to

---

[5] The Courts of Appeals for the Second and Fifth Circuits have held that a dominant shareholder's non pro rata stock surrender does not give rise to an ordinary loss. *Frantz* v. *Commissioner, supra; Schleppy* v. *Commissioner, supra.*

a controlling shareholder's non pro rata surrender of a portion of his shares.[6]

## B

The Finks contend that they sustained an immediate loss upon surrendering some of their shares to the corporation. By parting with the shares, they gave up an ownership interest entitling them to future dividends, future capital appreciation, assets in the event of liquidation, and voting rights.[7] Therefore, the Finks contend, they are entitled to an immediate deduction. See 26 U. S. C. §§ 165(a) and (c)(2). In addition, the Finks argue that any non pro rata stock transaction "give[s] rise to immediate tax results." Brief for Respondents 13. For example, a non pro rata stock dividend produces income because it increases the recipient's proportionate ownership of the corporation. *Koshland* v. *Helvering*, 298 U. S. 441, 445 (1936).[8] By analogy, the Finks argue that a non pro rata surrender of shares should be recognized as an immediate loss because it reduces the surrendering shareholder's proportionate ownership.

Finally, the Finks contend that their stock surrenders were not contributions to the corporation's capital. They note that a typical contribution to capital, unlike a non pro rata stock surrender, has no effect on the contributing shareholder's proportionate interest in the corporation. Moreover, the Finks argue, a contribution of cash or other property increases the net worth of the corporation. For example, a shareholder's

---

[6] The Finks concede that a pro rata stock surrender, which by definition does not change the percentage ownership of any shareholder, is not a taxable event. Cf. *Eisner* v. *Macomber*, 252 U. S. 189 (1920) (pro rata stock dividend does not produce taxable income).

[7] As a practical matter, however, the Finks did not give up a great deal. Their percentage interest in the corporation declined by only 4 percent. Because the Finks retained a majority interest, this reduction in their voting power was inconsequential. Moreover, Travco, like many corporations in financial difficulties, was not paying dividends.

[8] In most cases, however, stock dividends are not recognized as income until the shares are sold. See 26 U. S. C. § 305.

forgiveness of a debt owed to him by the corporation decreases the corporation's liabilities. In contrast, when a shareholder surrenders shares of the corporation's own stock, the corporation's net worth is unchanged. This is because the corporation cannot itself exercise the right to vote, receive dividends, or receive a share of assets in the event of liquidation. G. Johnson & J. Gentry, Finney and Miller's Principles of Accounting 538 (7th ed. 1974).[9]

## III

A shareholder who surrenders a portion of his shares to the corporation has parted with an asset, but that alone does not entitle him to an immediate deduction. Indeed, if the shareholder owns less than 100 percent of the corporation's shares, any non pro rata contribution to the corporation's capital will reduce the net worth of the contributing shareholder.[10] A shareholder who surrenders stock thus is similar to one who forgives or surrenders a debt owed to him by the corporation; the latter gives up interest, principal, and also potential voting power in the event of insolvency or bankruptcy. But, as stated above, such forgiveness of corporate debt is treated as a contribution to capital rather than a current deduction. *Supra*, at 94. The Finks' voluntary surrender of shares, like a shareholder's voluntary forgiveness of debt owed by the corporation, closely resembles an investment or contribution

---

[9] Treasury stock—that is, stock that has been issued, reacquired by the corporation, and not canceled—generally is shown as an offset to the shareholder's equity on the liability side of the balance sheet. G. Johnson & J. Gentry, Finney and Miller's Principles of Accounting 538 (7th ed. 1974).

[10] For example, assume that a shareholder holding an 80 percent interest in a corporation with a total liquidation value of $100,000 makes a non pro rata contribution to the corporation's capital of $20,000 in cash. Assume further that the shareholder has no other assets. Prior to the contribution, the shareholder's net worth was $100,000 ($20,000 plus 80 percent of $100,000). If the corporation were immediately liquidated following the contribution, the shareholder would receive only $96,000 (80 percent of $120,000). Of course such a non pro rata contribution is rare in practice. Typically a shareholder will simply purchase additional shares.

to capital. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders § 3.14, p. 3–59 (4th ed. 1979) ("If the contribution is voluntary, it does not produce gain or loss to the shareholder"). We find the similarity convincing in this case.

The fact that a stock surrender is not recorded as a contribution to capital on the corporation's balance sheet does not compel a different result. Shareholders who forgive a debt owed by the corporation or pay a corporate expense also are denied an immediate deduction, even though neither of these transactions is a contribution to capital in the accounting sense.[11] Nor are we persuaded by the fact that a stock surrender, unlike a typical contribution to capital, reduces the shareholder's proportionate interest in the corporation. This Court has never held that every change in a shareholder's percentage ownership has immediate tax consequences. Of course, a shareholder's receipt of property from the corporation generally is a taxable event. See 26 U. S. C. §§ 301, 316. In contrast, a shareholder's transfer of property to the corporation usually has no immediate tax consequences. § 263.

The Finks concede that the purpose of their stock surrender was to protect or increase the value of their investment in the corporation. Brief for Respondents 3.[12] They hoped to encourage new investors to provide needed capital and in the long run recover the value of the surrendered shares through increased dividends or appreciation in the value of their remaining shares. If the surrender had achieved its purpose, the Finks would not have suffered an economic loss. See

---

[11] It is true that a corporation's stock is not considered an asset of the corporation. A corporation's own shares nevertheless may be as valuable to the corporation as other property contributed by shareholders, as treasury shares may be resold. This is evidenced by the fact that corporations often purchase their own shares on the open market.

[12] Indeed, if the Finks did not make this concession their surrender probably would be treated as a nondeductible gift. See 26 CFR § 25.2511-1(h)(1) (1986).

Johnson, Tax Models for Nonprorata Shareholder Contributions, 3 Va. Tax. Rev. 81, 104–108 (1983). In this case, as in many cases involving closely held corporations whose shares are not traded on an open market, there is no reliable method of determining whether the surrender will result in a loss until the shareholder disposes of his remaining shares. Thus, the Finks' stock surrender does not meet the requirement that an immediately deductible loss must be "actually sustained during the taxable year." 26 CFR § 1.165–1(b) (1986).

Finally, treating stock surrenders as ordinary losses might encourage shareholders in failing corporations to convert potential capital losses to ordinary losses by voluntarily surrendering their shares before the corporation fails. In this way shareholders might avoid the consequences of 26 U. S. C. § 165(g)(1), which provides for capital-loss treatment of stock that becomes worthless.[13] Similarly, shareholders may be encouraged to transfer corporate stock rather than other property to the corporation in order to realize a current loss.[14]

---

[13] The Tax Reform Act of 1986, Pub. L. 99–514, §§ 301, 311, 100 Stat. 2216, 2219, eliminated the differential tax rates for capital gains and ordinary income. The difference between a capital loss and an ordinary loss remains important, however, because individuals are permitted to deduct only $3,000 of capital losses against ordinary income each year, and corporations may not deduct any capital losses from ordinary income. 26 U. S. C. § 1211. In contrast, ordinary losses generally are deductible from ordinary income without limitation. §§ 165(a) and (c)(2).

The Court of Appeals in this case did not discuss the possibility of allowing a capital loss rather than an ordinary loss, and the parties raise it only in passing. We note, however that a capital loss is realized only upon the "sal[e] or exchang[e]" of a capital asset. 26 U. S. C. § 1211(b)(3). A voluntary surrender, for no consideration, would not seem to qualify as a sale or exchange. Frantz v. Commissioner, 784 F. 2d, at 124.

[14] Our holding today also draws support from two other sections of the Code. First, § 83 provides that, if a shareholder makes a "bargain sale" of stock to a corporate officer or employee as compensation, the "bargain" element of the sale must be treated as a contribution to the corporation's capital. S. Rep. No. 91–552, pp. 123–124 (1969); 26 CFR § 1.83–6(d)

We therefore hold that a dominant shareholder who voluntarily surrenders a portion of his shares to the corporation, but retains control, does not sustain an immediate loss deductible from taxable income. Rather, the surrendering shareholder must reallocate his basis in the surrendered shares to the shares he retains.[15] The shareholder's loss, if

(1986). Section 83 reversed the result in *Downer* v. *Commissioner*, 48 T. C. 86 (1967), a decision predicated on the fragmented view of stock ownership adopted by the Court of Appeals in this case. To be sure, Congress was concerned in § 83 with transfers of restricted stock to employees as compensation rather than surrenders of stock to improve the corporation's financial condition. In both cases, however, the shareholder's underlying purpose is to increase the value of his investment.

Second, if a shareholder's stock is redeemed—that is, surrendered to the corporation in return for cash or other property—the shareholder is not entitled to an immediate deduction unless the redemption results in a substantial reduction in the shareholder's ownership percentage. §§ 302 (a), (b), (d); 26 CFR § 1.302–2(c) (1986). Because the Finks' surrenders resulted in only a slight reduction in their ownership percentage, they would not have been entitled to an immediate loss if they had received consideration for the surrendered shares. 26 U. S. C. § 302(b). Although the Finks did not receive a direct payment of cash or other property, they hoped to be compensated by an increase in the value of their remaining shares.

[15] The Finks remained the controlling shareholders after their surrender. We therefore have no occasion to decide in this case whether a surrender that causes the shareholder to lose control of the corporation is immediately deductible. In related contexts, the Code distinguishes between minimal reductions in a shareholder's ownership percentage and loss of corporate control. See § 302(b)(2) (providing "exchange" rather than dividend treatment for a "substantially disproportionate redemption of stock" that brings the shareholder's ownership percentage below 50 percent); § 302(b)(3) (providing similar treatment when the redemption terminates the shareholder's interest in the corporation).

In this case we use the term "control" to mean ownership of more than half of a corporation's voting shares. We recognize, of course, that in larger corporations—especially those whose shares are listed on a national exchange—a person or entity may exercise control in fact while owning less than a majority of the voting shares. See Securities Exchange Act of 1934, § 13(d), 48 Stat. 894, 15 U. S. C. § 78m(d) (requiring persons to report acquisition of more than 5 percent of a registered equity security).

any, will be recognized when he disposes of his remaining shares. A reallocation of basis is consistent with the general principle that "[p]ayments made by a stockholder of a corporation for the purpose of protecting his interest therein must be regarded as [an] additional cost of his stock," and so cannot be deducted immediately. *Eskimo Pie Corp.* v. *Commissioner,* 4 T. C., at 676. Our holding today is not inconsistent with the settled rule that the gain or loss on the sale or disposition of shares of stock equals the difference between the amount realized in the sale or disposition and the shareholder's basis in the particular shares sold or exchanged. See 26 U. S. C. § 1001(a); 26 CFR § 1.1012–1(c)(1) (1986). We conclude only that a controlling shareholder's voluntary surrender of shares, like contributions of other forms of property to the corporation, is not an appropriate occasion for the recognition of gain or loss.

## IV

For the reasons we have stated, the judgment of the Court of Appeals for the Sixth Circuit is reversed.

*It is so ordered.*

JUSTICE BLACKMUN concurs in the result.

JUSTICE WHITE, concurring.

Although I join the Court's opinion, I suggest that there is little substance in the reservation in n. 15 of the question whether a surrender of stock that causes the stockholder to lose control of the corporation is immediately deductible as an ordinary loss. Of course, this case does not involve a loss of control; but as I understand the rationale of the Court's opinion, it would also apply to a surrender that results in loss of control. At least I do not find in the opinion any principled ground for distinguishing a loss-of-control case from this one.

JUSTICE SCALIA, concurring in the judgment.

I do not believe that the Finks' surrender of their shares was, or even closely resembles, a shareholder contribution to

corporate capital. Since, however, its purpose was to make the corporation a more valuable investment by giving it a more attractive capital structure, I think that it was, no less than a contribution to capital, an "amount paid out . . . for . . . betterments made to increase the value of . . . property," 26 U. S. C. § 263 (a)(1), and thus not entitled to treatment as a current deduction.

JUSTICE STEVENS, dissenting.

The value of certain and predictable rules of law is often underestimated. Particularly in the field of taxation, there is a strong interest in enabling taxpayers to predict the legal consequences of their proposed actions, and there is an even stronger general interest in ensuring that the responsibility for making changes in settled law rests squarely on the shoulders of Congress. In this case, these interests are of decisive importance for me.

The question of tax law presented by this case was definitively answered by the Board of Tax Appeals in 1941. See *Miller* v. *Commissioner*, 45 B. T. A. 292, 299; *Budd International Corp.* v. *Commissioner*, 45 B. T. A. 737, 755–756.[1] Those decisions were consistently followed for over 40 years, see, *e. g.*, *Smith* v. *Commissioner*, 66 T. C. 622, 648 (1976); *Downer* v. *Commissioner*, 48 T. C. 86, 91 (1967); *Estate of Foster* v. *Commissioner*, 9 T. C. 930, 934 (1947), and the Internal Revenue Service had announced its acquiescence in the decisions. See 1941–2 Cum. Bull. 9 (acquiescing in *Miller*); 1942–2 Cum. Bull. 3 (acquiescing in *Budd International*). Although Congress dramatically revamped the Tax Code in 1954, see Internal Revenue Code of 1954, Pub. L. 83–591, 68A Stat. 3, it did not modify the Tax Court's approach to this issue.

It was only in 1977 (after the Finks had transferred their stock to the corporation), that the Commissioner of Inter-

---

[1] The principle applied in those decisions dates back even further. See *Burdick* v. *Commissioner*, 20 B. T. A. 742 (1930), aff'd, 59 F. 2d 395 (CA3 1932); *Wright* v. *Commissioner*, 18 B. T. A. 471 (1929).

nal Revenue retracted his acquiescence in the Tax Court's interpretation.[2] But instead of asking Congress to reject the longstanding interpretation, the Commissioner asked the courts to take another look at the statute. Two Courts of Appeals accepted the Commissioner's new approach, and reversed the Tax Court without giving much, if any, weight to the Tax Court's nearly half-century-old construction.[3] *Tilford* v. *Commissioner*, 705 F. 2d 828 (CA6 1983); *Schleppy* v. *Commissioner*, 601 F. 2d 196 (CA5 1979). After these two reversals, the Tax Court itself reversed its position in 1984, believing that "[r]ecent appellate level disapproval of the position renders it inappropriate for us to continue to justify the position solely on the basis of its history." *Frantz* v. *Commissioner*, 83 T. C. 162, 174–182 (1984), aff'd, 784 F. 2d 119 (CA2 1986), cert. pending, No. 86–11.

I believe that these courts erred in reversing the longstanding interpretation of the Tax Code. The Commissioner certainly had a right to advocate a change, but in my opinion he should have requested relief from the body that has the authority to amend the Internal Revenue Code. For I firmly believe that "after a statute has been construed, either by this Court or by a consistent course of decision by other federal judges and agencies, it acquires a meaning that should be as clear as if the judicial gloss had been drafted by the Congress itself." *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 268 (1987) (STEVENS, J., concurring in part and dissenting in part). A rule of statutory construction that "has been consistently recognized for more than 35 years" acquires a clarity that "is simply beyond per-

---

[2] The Commissioner appears to have begun reconsidering his position around 1969. See Note, *Frantz* or *Fink:* Unitary or Fractional View for Non-Prorata Stock Surrenders, 48 U. Pitt. L. Rev. 905, 908–909 (1987) (hereafter Note).

[3] Ignoring the import of the long line of Tax Court cases, one court stated: "We find no Court of Appeals decision that determines the correctness of these decisions. We therefore write on a clean sheet." *Schleppy* v. *Commissioner*, 601 F. 2d 196, 198 (CA5 1979).

adventure." *Herman & MacLean* v. *Huddleston,* 459 U. S. 375, 380 (1983).

There may, of course, be situations in which a past error is sufficiently blatant "to overcome the strong presumption of continued validity that adheres in the judicial interpretation of a statute." *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.,* 476 U. S. 409, 424 (1986). But this is surely not such a case.[4] The Court makes no serious effort to demonstrate that its result is compelled by—or even consistent with—the language of the statute.[5] The mere fact that the Court's interpretation of the Internal Revenue Code may be preferable to the view that prevailed for years is not, in my opinion, a sufficient reason for changing the law.

If Congress lacked the power to amend statutes to rectify past mistakes, and if the only value to be achieved in constru-

---

[4] Strong arguments can be made in support of either view, as the split between the Second and Sixth Circuits and the dissenting opinion of the four Tax Court Judges indicate. See *Frantz* v. *Commissioner,* 83 T. C. 162, 187 (1984) (Parker, J., with whom Fay, Goffe, and Wiles, JJ., joined, dissenting). See also Bolding, Non-Pro Rata Stock Surrenders: Capital Contribution, Capital Loss or Ordinary Loss?, 32 Tax Law. 275 (1979); Note, *supra.* Whether it makes sense to encourage stock surrenders that may enable a sinking corporation to stay afloat in cases like this is at least debatable. But whatever the correct policy choice may be, I would adhere to an interpretation of technical statutory language that has been followed consistently for over 40 years until Congress decides to change the law. Surely that is the wisest course when the language of the statute provides arguable support for the settled rule.

[5] Uncharacteristically, the Court does not begin its analysis by quoting any statutory language, cf. *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring), either from § 165 of the Code, which defines "losses," or from § 1016, which deals with adjustments to basis. Rather, it launches into a discussion of voluntary contributions to capital, see *ante,* at 94–95, even though this was clearly not such a contribution because it had no impact on the net worth of the corporation. The opinion includes a discussion of a hypothetical example, *ante,* at 96, n. 10, and policy reasons supporting the Court's result, but surprisingly little mention of statutory text. The statutory basis for the taxpayer's position is adequately explained in the opinions cited *ante,* at 92–93, n. 3.

ing statutes were accurate interpretation, it would be clear that a court or agency should feel free at any time to reject a past erroneous interpretation and replace it with the one it believes to be correct. But neither of these propositions is true; Congress does have the ability to rectify misinterpretations, and, once a statute has been consistently interpreted in one way, there are institutional and reliance values that are often even more important than the initial goal of accurate interpretation.

The relationship between the courts or agencies, on the one hand, and Congress, on the other, is a dynamic one. In the process of legislating it is inevitable that Congress will leave open spaces in the law that the courts are implicitly authorized to fill. The judicial process of construing statutes must therefore include an exercise of lawmaking power that has been delegated to the courts by the Congress. But after the gap has been filled, regardless of whether it is filled exactly as Congress might have intended or hoped, the purpose of the delegation has been achieved and the responsibility for making any future change should rest on the shoulders of the Congress. Even if it is a consensus of lower federal-court decisions, rather than a decision by this Court, that has provided the answer to a question left open or ambiguous in the original text of the statute, there is really no need for this Court to revisit the issue. Moreover, if Congress understands that as long as a statute is interpreted in a consistent manner, it will not be reexamined by the courts except in the most extraordinary circumstances, Congress will be encouraged to give close scrutiny to judicial interpretations of its work product. We should structure our principles of statutory construction to invite continuing congressional oversight of the interpretive process.[6]

---

[6] "The doctrine of *stare decisis* has a more limited application when the precedent rests on constitutional grounds, because 'correction through legislative action is practically impossible.' *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 407–408 (Brandeis, J., dissenting). See *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600, 627 (POWELL, J., concurring)." *Thomas*

Our readiness to reconsider long-settled constructions of statutes takes its toll on the courts as well. Except in the rarest of cases, I believe we should routinely follow Justice Cardozo's admonition:

> "[T]he labor of judges would be increased almost to the breaking point if every past decision could be re-opened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him." B. Cardozo, The Nature of the Judicial Process 149 (1921).

In addition to the institutional ramifications of rejecting settled constructions of law, fairness requires consideration of the effect that changes have on individuals' reasonable reliance on a previous interpretation. This case dramatically illustrates the problem. Mr. Fink surrendered his shares in December 1976. Mrs. Fink surrendered hers in January 1977. At that time the law was well settled: the Tax Court had repeatedly reaffirmed the right to deduct such surrenders as ordinary losses, and the Commissioner had acquiesced in this view for 35 years.[7] See *supra*, at 101. It was only on April 11, 1977, that the Commissioner announced his non-

v. *Washington Gas Light Co.*, 448 U. S. 261, 272–273, n. 18 (1980) (plurality opinion).

See also *Edelman* v. *Jordan*, 415 U. S. 651, 671 (1974); *Boys Markets* v. *Retail Clerks*, 398 U. S. 235, 259–260 (1970) (Black, J., dissenting); *Swift & Co.* v. *Wickham*, 382 U. S. 111, 133–134 (1965) (Douglas, J., dissenting).

[7] The Internal Revenue Service's Cumulative Bulletin explains the effect of an announcement of acquiescence:

"In order that taxpayers and the general public may be informed whether the Commissioner has acquiesced in a decision of the Tax Court of the United States, formerly known as the United States Board of Tax Appeals, disallowing a deficiency in tax determined by the Commissoner to be due, announcement will be made in the semimonthly Internal Revenue Bulletin at the earliest practicable date. Notice that the Commissioner has acquiesced or nonacquiesced in a decision of the Tax Court relates only to the issue or issues decided adversely to the Government. *Decisions so acquiesced in should be relied upon by officers and employees of the Bureau of Internal Revenue as precedents in the disposition of other cases.*" 1942–2 Cum. Bull. IV (emphasis added).

acquiescence. See Internal Revenue Bulletin No. 1977–15, p. 6 (April 11, 1977). "In my view, retroactive application of the Court's holding in cases such as this is so fundamentally unfair that it would constitute an abuse of the Commissioner's discretion." *Dickman* v. *Commissioner*, 465 U. S. 330, 353, n. 11 (1984) (POWELL, J., dissenting).

I respectfully dissent.