IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

JED C. TRUETT,                        )
                                      )
        Plaintiff,                    )    TC-MD 170224G
                                      )
    v.                                )
                                      )
DEPARTMENT OF REVENUE,                )
State of Oregon,                      )
                                      )
        Defendant.                    )    **FINAL DECISION**[1]

This is an appeal of adjustments to the 2012 and 2013 returns of an S corporation's sole

shareholder. Trial was held on August 16, 2017. Attorney Dominic Paris appeared for Plaintiff

(Truett), and Truett testified on his own behalf. Auditors Nancy Berwick (Berwick) and Ira

Mitchell appeared for Defendant, and Berwick testified for Defendant. Plaintiff's Exhibit 15 was

admitted with objection, and the remainder of Plaintiff's Exhibits 1 to 53 were admitted without

objection. Defendant's Exhibits A to W were admitted without objection.

## I. STATEMENT OF FACTS

During the tax years at issue, Truett was the sole owner and shareholder of Metro

Planning, Inc. (MPI), an Oregon S Corporation. Truett founded MPI in 2005 to perform land use

consulting work for developers. Beginning in 2007, MPI faced decreasing business from Oregon

developers and expanded its services to include hazard mitigation work for public bodies—

counties, parishes, cities, and tribes—in Louisiana and Texas. During the ensuing years, MPI

contracted with those public bodies to prepare natural disaster plans and perform disaster

mitigation work (such as buying out residential properties located underneath flood control

---

[1] This Final Decision incorporates without change the court's Decision, entered February 23, 2018. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

dams). MPI's clients received funding from FEMA—the Federal Emergency Management Agency—and MPI's work included preparing grant applications for submission to FEMA. During 2012 and 2013—the years at issue—almost all of MPI's revenue was derived from hazard planning and mitigation work in Louisiana and Texas.

A.    *Business Financing*

MPI reported losses on its tax returns each year from 2005 through 2013, as follows.

| Year | Ordinary Income |
|------|-----------------|
| 2005 | ($ 22,364) |
| 2006 | ($ 69,642) |
| 2007 | ($ 67,845) |
| 2008 | ($113,464) |
| 2009 | ($ 82,807) |
| 2010 | ($167,448) |
| 2011 | ($289,279) |
| 2012 | ($251,827) |
| 2013 | ($143,813) |

(Def's Ex H at 1.) The losses amounted to over $1 million in total. Truett attributed the initial losses to the cost of training employees in a new and growing business, and the later losses to his retaining more employees than business justified after the recession began in 2007.

1.    *2005–2009*

According to Truett, MPI kept afloat on borrowed money. Truett testified that during the startup phase of the business he borrowed from the bank and from credit card companies, using his house as collateral. MPI's early bank statements show frequent draws on a commercial line of credit followed by smaller repayments. Three loans from Summit Bank are identified by number during the period from 2005 to 2007. (Exs 38 at 1, 12; 39 at 11.) Another line of credit is identified without a number during that period. (Ex 39 at 7.) In November 2006, $10,000 was deposited into MPI's account via a credit card balance transfer. (Ex 38 at 26.) MPI paid recording fees associated with a loan in December 2006. (Ex 38 at 29.)

Truett testified that MPI's business dropped off in 2007 as Oregon real estate development slowed. By the end of 2007, MPI began incurring frequent overdraft charges. (Ex 39 at 37.) In 2008, MPI made larger payments on its loans from Summit Bank, although it still borrowed additional funds as late as December. (Ex 40 at 40, 42.) In mid-2009, MPI closed its account with Summit Bank. (Ex 42 at 15.)

2. *2010–11*

a. Middleman Services

In 2010, MPI's account at US Bank began showing deposits of $20,000 per month or more from Middleman Services (Middleman), a factoring company. (Ex 43 at 15.) Later deposits from Middleman exceeded $40,000 per month. (Ex 43 at 39.) The Middleman deposits continued with some regularity through October 2011. (Ex 44 at 31.)

B. Truett

In 2010 and continuing into 2011, Truett removed himself from the MPI payroll and collected unemployment. (Ex H at 12–14.) At the same time, Truett made significant transfers from his personal checking account to MPI's bank account. Net deposits from Truett's personal account amounted to $147,130 in 2010 and $56,635 in 2011. (*See* Ptf's Trial Mem at 11–12.)

Truett testified that his grandmother died in 2010 and left him approximately $500,000, and that his father died in 2011 and left him another $110,000 in money and property. The name of Truett's grandmother's estate was listed on Truett's 2010 Form 1040, although no dollar amount was provided there. (Ex S at 4.) Truett filed an amended return for 2010 that reported $6,688 of additional income from a trust K-1. (Ex 52.)

/ / /

/ / /

Truett began reporting an increase in interest income on his returns in 2010, as follows.

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|
| *Interest* | $-0- | $119 | $276 | $-0- | $-0- | $6,527[2] | $31,331 | $33,522 | $35,801 |

(Exs 47–51; S at 1; 53; 1 at 1; 3 at 1.) Truett testified that his transfers to MPI in 2010 and 2011 were shareholder loans, and that MPI paid him interest on those loans. An accountant employed by Truett during the audit had previously written to Defendant that Truett's transfers to MPI were capital contributions, not loans. (Ex M.)

MPI's ledgers contained an account named "S/H Loan Payable" that recorded numerous credit card expenses for food, pet supplies, haircuts, and other charges that Truett did not dispute were personal, as well as journal entries with "interest on Jed's loan" in the description. Defendant calculated that MPI's 2012 ledger shows $33,695.41 in personal bills, checks, credit card charges, and transfers that have not been taxed. (*See* Ex I at 17–18.) Plaintiff did not dispute Defendant's calculation.

3. *2012–2013*

a. Watson

MPI's 2012 and 2013 bank statements show numerous large deposits that correlate with entries in its general ledger under the name "Jonny Watson." (*Compare*, *e.g.*, Ex 45 *with* Exs 26 at 37–38, 27 at 37–38; Ex 46 *with* Ex 28 at 62–63.) Jonny Watson was MPI's landlord and Truett's friend. According to Truett, in 2010 Watson had extended MPI an unsecured $100,000 line of credit. A deposit exceeding $100,000 passed through MPI's bank account and was wired to another bank in November 2010. (Ex 43 at 34–35.) Truett testified that in 2011 or 2012, Watson paid off MPI's obligation to Middleman and MPI began financing with Watson instead.

Truett testified that Watson agreed to loan him up to 90 percent of the face value of the

[2] Excludes additional income from trust K-1 reported on amended return.

contracts MPI had signed or was about to sign. Watson and MPI memorialized their transactions in instruments called Assignments of Collateral Financial Agreement ("ACFAs"). (Exs 16–17.) ACFA number 21 is typical of the form's terms:

"Description of Collateral Invoices: Newton County Acquisition Phase 3-4-5
"Date Invoiced: To be invoiced
"Customer Information: Newton County, Texas
"Amount Invoiced: $5500.00
"Amount Loaned: $4950.00
"Terms: 15% APR
"Loan Date: 1-18-2012[3]
"Expected Date of Payoff: 60 days"

(Ex 16 at 85.) According to Truett, the form of the ACFA had previously been used by Watson in transactions with another party. He testified that the ACFAs were executed before any invoices had been issued and that the ACFAs did not correlate to specific invoices. Truett testified that MPI used Watson "like a line of credit," borrowing the minimum amount necessary to make ends meet. Truett would begin by determining how much MPI needed to borrow, then divide that number by 0.9 to calculate an "Amount Invoiced"—a number that represented the amount of MPI's receivables that would secure the loan from Watson. Truett ensured that the total of the "Amount Invoiced" numbers on all the ACFAs for a particular contract did not exceed the total value of the contract so that the "Amount Loaned" never exceeded 90 percent of a contract's value. For each ACFA, Truett would estimate a date of payoff based on when he thought a project would reach a stage of completion that would allow him to invoice his client. Truett and Watson would sign the ACFA, and Watson would immediately loan MPI the money.

Eighty-three ACFAs were provided for 2012 and 2013, sequentially numbered from 18 to 101.[4] The last ACFA was executed in June 2013. (Ex 17 at 1.) Truett testified that Watson

---

[3] The year 2011 is changed by hand to 2012 on the form

[4] ACFA number 91 was missing from the sequence.

stopped lending to MPI at that time. The totals of the amounts reported on the ACFAs as "invoiced" and "loaned," and the totals of MPI's 2012 and 2013 invoices are summarized in the following table. (Exs Q at 4–5; 20 at 7; 23 at 9.)

|  | *2012* | *2013* | *Two-Year Total* |
|---|---|---|---|
| *ACFA "Amount Invoiced"* | $620,816 | $246,730 | $867,546 |
| *ACFA "Amount Loaned"* | $557,865 | $221,808 | $779,673 |
| *Total of actual invoices* | $376,985 | $368,943 | $745,928 |

Truett testified that he always told Watson the truth and that MPI did eventually invoice all the amounts stated on the ACFAs. Truett further testified that many of the amounts borrowed against in 2012 were not invoiced until 2013. Truett testified that MPI was frequently unable to invoice its customers before the expected payoff date because of project delays caused by coordinating with federal and state agencies. For example, ACFA number 21—quoted above— had an expected payoff date of 60 days, but annotations on it indicate actual payoff occurred 124 days after the loan date. (Ex 16 at 85.) Many later 2012 ACFAs indicated lengthier periods before their expected payoff dates: 90 days, 120 days, or 210 days. In 2013, as MPI continually failed to timely repay the loans, the expected payoff dates were explicitly open-ended: "120+ days" or "180+ days."

In October 2013, MPI's Louisiana and Texas employees split off into a new company and assumed responsibility for the five remaining contracts from that region. Truett testified that MPI assigned 80 percent of the remaining invoices on those contracts to the new company. On some contracts, the invoice would direct the client to remit 80 percent to the new company. (*See*, *e.g.*, Ex 24 at 33.) On other contracts, Truett testified MPI would collect the entire invoice and reimburse the new company 80 percent. MPI remained liable to Watson for the full face value of the ACFAs secured by those contracts.

/ / /

b.      Gross receipts

MPI's general ledger accounts report total receipts of $353,185 in 2012 and $367,530 in 2013.  (Exs 26 at 38–41; 27 at 39–43; 28 at 87.)  Those accounts netted out a few thousand dollars' worth of "credit memos," with which MPI accounted for free work it performed in some poorer jurisdictions.  MPI included the 2012 figure as the balance of its receipts on its 2012 return.  (Ex A at 3.)  MPI's 2013 return reported receipts of $345,635.  (Ex B at 4.)

MPI's 2013 ledger contains significant journal entries.  Accounts receivable were reduced by $44,261 with the following description: "To get books back in line with 2013 tax return."  (Ex 28 at 25.)  Accounts payable were reduced by $63,162, also "[t]o get books back in line with 2013 tax return."  (*Id*. at 35.)  Undeposited funds were reduced by $21,955 "[t]o get books back in line with 2013 tax return."  (Ex 28 at 26.)  Both the Services account and the Undeposited Funds account were increased by $14,595 "[t]o record Sales Cash received." (*Id*. at 26, 87.)

MPI's ledgers contained gaps in the invoice numbers.  Out of a range of 175 numbers in 2012, 13 were missing, or 7.4 percent.  (*See* Ptf's Ex 20.)  Excluding one outlier, in 2013 the range was 240, with 33 missing, or 13.7 percent.  (*See* Ptf's Ex 23.)  The outlier in 2013 was one of a few overdue invoices that were out of sequence by as much as a hundred numbers—two other similar outliers fell within the general range, both overdue invoices.  In addition, the dates on the invoices and the dates payment was received were frequently identical.

Truett testified that he personally handled invoicing, although for a period of time he had an assistant keeping the books.  According to Truett, the gaps in the sequence came from his deleting invoices on which he had made a mistake rather than voiding them.  He testified that MPI did not maintain another set of books.

Although she ultimately concluded that bank deposit analysis did not accurately reflect MPI's gross receipts, Berwick initially performed an analysis that indicated MPI's gross receipts were $950,842 in 2012 and $547,356 in 2013. (Ex Q at 2,7.) Because Berwick believed the Watson transactions were factoring agreements rather than loans, those numbers include amounts received from Watson.

Defendant's conference officer adjusted MPI's 2012 receipts to $691,940, and Berwick adjusted the 2013 receipts to $537,755. (Exs E at 2; D at 10.) The conference officer concluded that the ACFAs represented loans rather than factoring transactions, then reasoned that the ACFAs were the best evidence of MPI's 2012 receipts because they were contemporaneous statements by MPI to a lender of the amounts it had invoiced, and MPI could expect payment from virtually all of the public clients it invoiced. He adjusted MPI's 2012 receipts to what he calculated to be the total of the "amounts invoiced" shown on the ACFAs, plus $2,224 (the amount by which MPI's accounts receivable decreased in 2012).[5]

Both Berwick and the conference officer placed some weight on statistics provided by an online service called "BizStats." According to BizStats, an average "specialized design services" company spends 38 percent of its sales revenue on wages and officers' compensation and 37 percent of its sales revenue on "other SG&A" expenses, with the remainder of the revenue being absorbed within much smaller categories such as rent, taxes, benefits, and profit. (Ex G.) MPI's reported wages were $308,216 in 2012 and $228,954 in 2013—87 percent and 66 percent of reported gross sales, respectively. Berwick reasoned that a larger-than-average percentage of MPI's stated revenue going to wages was a sign that it had understated its revenue.

---

[5] Both parties at times mistook the sum of the "amounts invoiced" on the ACFAs ($620,816) for the sum of the "amounts loaned" ($557,865). (*Compare* Ex E at 2 *with* Ex Q at 4; Ptf's Ex 15.) Believing the latter number was $620,816, the conference officer divided it by 0.9 to convert it to the sum of the invoices—thus inflating the actual sum from the ACFAs.

B.      *Property Taxes*

MPI paid $4,366.03 to the Lane County Tax Collector on November 15, 2012.  (Ex 14.)

Of that amount, $3,056.54 went to pay property taxes and the remainder paid interest.  (Ex 13.)

MPI claimed a $3,032 deduction for its payment of property taxes that was disallowed at audit

on the ground that MPI's lease did not require it to pay property taxes.  (Ex D at 3–4.)

Truett provided a copy of a lease agreement with an original term ending February 28,

2012, which Truett testified was the lease that continued throughout the years at issue.  (Ptf's

Ex 12 at 1.)  Additional details about the lease provisions are included in the analysis below.

C.      *Concessions and Stipulations*

With respect to Defendant's claim to disallow Truett's 2012 net operating loss (NOL)

deduction, the parties stipulated at trial that the only issue was whether Truett had sufficient basis

in MPI to claim that loss.  Truett withdrew his claim for a mortgage interest deduction before

trial.  Defendant stipulated at trial that Truett recognized no gain in 2013 from his sale of real

estate in Texas (a $35,000 adjustment had previously been made at audit).

## II.  ANALYSIS

After concessions and stipulations, the issues for decision are as follows.

1.      Whether and to what extent Defendant's adjustments to MPI's 2012 and
        2013 gross receipts were proper;

2.      Whether and to what extent Truett's basis in MPI entitled him to net
        operating loss (NOL) deductions in 2012 and 2013 for losses incurred in
        2010 and 2011;

3.      Whether MPI's payments to and for Truett in 2012 were taxable as
        distributions in excess of basis; and

4.      Whether MPI is entitled to deduct its payment of property taxes in 2012.

Subject to exceptions not pertinent here, Oregon taxable income is equal to federal

taxable income for both individuals and S corporations. ORS 316.048; 314.732(2)(a).[6] The court therefore relies on the Internal Revenue Code (IRC) and federal tax regulations, as interpreted by federal case law. *See* ORS 316.032(2). The income of S corporations is not taxed at the corporate level, but flows through to its shareholders pro rata, with the result that all items of income, loss, and deduction are accounted for by the shareholders on their personal returns. IRC § 1366(a)(1); ORS 314.734(1).

A party seeking affirmative relief from this court must bear the burden of proof by a preponderance of the evidence. ORS 305.427. That standard is met by a showing that "the facts asserted are more probably true than false[.]" *Cook v. Michael*, 214 Or 513, 527, 330 P2d 1026 (1958). Here, Truett must bear the burden as to decreasing MPI's 2012 and 2013 gross receipts, increasing its 2012 property tax deduction, and increasing its 2013 net operating loss (NOL) deduction. Defendant must bear the burden as to reducing MPI's 2012 NOL deduction and increasing Truett's 2012 income for any distributions in excess of basis, although, as discussed below, the burden of going forward with the evidence on those issues shifted to Truett.

A.      *MPI's 2012 and 2013 Gross Receipts*

A taxpayer in Oregon must keep "such permanent books of account or records * * * as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information." 26 CFR § 1.6001–1(a); IRC § 6001; *Brenner v. Dept. of Rev.(Brenner)*, 9 OTR 299, 305–06 (1983). "Where a taxpayer's books do not clearly reflect income, the Department of Revenue may demonstrate unreported income 'by any practicable proof that is available in the circumstances of the particular situation.' " *Danielson v. Dept. of Rev. (Danielson)*, TC–MD 160282C, WL 5158730 at *3 (Or Tax M Div Nov 7, 2017)

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

(quoting *Brenner*, 9 OTR at 306; *cf. U.S. v. Doyle*, 234 F2d 788, 793 (7th Cir 1956). One indirect method of determining income is bank deposit analysis, which involves inferring that deposits into a taxpayer's bank account are income. *Brenner*, 9 OTR at 302 n 2; *Doyle*, 234 F2d at 793. Another method is tallying invoices, on the theory that receipts in a given year will approximately equal the amounts invoiced that year. *Danielson*, 2017 WL 5158730 at *4.

Here, Truett has provided three kinds of evidence of MPI's gross receipts: its general ledgers, its bank statements, and its invoices. Although none of those documents is without uncertainty, cumulatively they support reducing Defendant's adjustment.

In many cases, MPI's ledger entries are consistent with MPI's bank statements and the ACFAs. However, MPI's bank statements did not include checks, meaning that it is impossible to line up every expense. Furthermore, journal entries of up to $60,000—explicitly made for the purpose of lining up the ledgers with the tax returns—show there are significant uncertainties. MPI's income cannot be determined solely from its ledgers.

Bank deposit analysis of MPI's account likewise provides an incomplete record. Bank statements for Truett's personal account—and for MPI's Louisiana and Texas accounts—were unavailable. It is uncertain how large a difference those omissions make. However, given that Defendant previously concluded that the transactions with Watson were loans, the income from Watson should not be included in the bank deposit analyis.[7]

MPI's invoices are a third source of information about its receipts. The evidence shows that virtually all of MPI's invoices were paid, so the total of the invoices should be fairly close to amount collected—provided all of MPI's invoices were submitted into evidence. Reasons for

---

[7] At trial, Berwick suggested the conference officer's determination that the ACFAs were loans was incorrect, and that the ACFAs were actually factoring agreements. Although the ACFA form resembles a factoring agreement, the ACFAs as filled out by MPI and Watson were inconsistent with factoring because the "to be invoiced" showed no invoice had yet been issued. In any event, Defendant did not assert a recharacterization of the Watson transactions as factoring agreements as a basis for increasing Truett's liability before trial.

doubting the completeness of the invoices include the gaps in their numbering and the fact that the ledger recorded several invoices as created and paid on the same day, raising the possibility that data was entered after the fact from a second set of books.

Truett's testimony overall was credible, and his story of a cash-strapped company falling deeper into debt is supported by MPI's bank statements. He credibly testified that MPI had only one primary account, that its customers did not pay cash, and that there was no second set of books. MPI's actual invoices show dates preceding the ledger invoice dates by days or weeks, which is consistent with Truett's testimony that he personally invoiced clients while an assistant prepared the books. In that light, the similarity between ledger invoice dates and ledger payment dates is more likely a bookkeeping error than evidence of concealed receipts. Truett testified that many bank statements and checks were no longer available after the passage of seven or eight years. Truett further testified that he himself had produced the gaps in MPI's invoices by mistakenly deleting erroneous invoices rather than voiding them. The missing invoices accounted for a relatively small percentage of the total invoices provided.

Berwick argued that the amounts stated as "invoiced" on the ACFAs were the best evidence of MPI's income, on the theory that Truett had told his lender that he had invoiced those amounts. However, that reasoning is not consistent with the text of the ACFAs, which do not state that any amounts had been invoiced at the time the agreements were signed. To the contrary, the ACFAs represent to the lender what amounts will be invoiced—in most cases in conjunction with a payoff date months in the future. The text of the ACFAs supports Truett's testimony that they were loans on prospective receivables not tied to any particular invoices.

Averages from BizStats played a role in both Berwick's and the conference officer's evaluation of the reliability of Truett's evidence. That evidence is given little weight by the

court because it does not have enough information to assess its reliability. First, BizStats's sources and methods are unknown. Second, the standard deviation associated with its average numbers is unknown. Third, it is unknown how the BizStats categories overlap with MPI's reported wages. In particular, BizStats separates wages and "SG&A" expenses (presumably "selling, general, and administrative" expenses), which together account for 75 percent of sales revenue on average. If MPI's reported wages included wages for both production and administrative employees, it is possible that the proper comparison in BizStats would be the total of both categories.

The best evidence of MPI's gross receipts is found in its ledgers, bank deposits, and invoices, which are summarized in the table that follows. The figures for the bank deposits are computed by subtracting the "amounts loaned" on the ACFAs from the figures reached by Berwick in her analysis.

|  | *Ledgers* | *Bank Deposits* | *Invoices* |
|---|---|---|---|
| *2012* | $353,185 | $392,977 | $376,985 |
| *2013* | $367,530 | $325,548 | $368,943 |
| *Two-Year Total* | $720,715 | $718,525 | $745,928 |

The numbers indicated by the three methods converge to within 10 to 12 percent for each year, and to within 4 percent for the two-year total. Cumulatively, they support Truett's testimony that MPI's bookkeeping contained errors but did not conceal the large amounts of income imputed to it by Defendant. The court finds that Truett has proven MPI's gross receipts were no higher than the highest amount for each year in the table above: $392,977 in 2012 and $368,943 in 2013.

B.      *Net Operating Loss (NOL) Deductions*

Taxpayers whose deductions exceed their gross income in one year may "carry over" the excess deduction as an NOL and claim it in a subsequent year. IRC § 172. An S corporation's NOL passes through pro rata to its shareholders, who may claim a deduction for it up to the

amount of their bases in either the corporation's stock ("stock basis") or its indebtedness ("debt basis"). IRC § 1366(a)(1), (d)(1). Stock basis is increased by a shareholder's capital contributions to the corporation. IRC § 1016(a)(1); *Comm'r v. Fink*, 483 US 89, 94 (1987). Debt basis is increased by a shareholder loan to the corporation.

The question of whether Truett is entitled to an NOL deduction for 2012 or 2013 hinges on whether the prior years' transfers from his personal bank account to MPI's account were loans or capital contributions. Truett concedes he had no basis in MPI as of December 31, 2009, and that the net transfers from his account to MPI's shown on the bank statements confirm basis increases of $147,130 in 2010 and $56,905 in 2011. (Ptf's Trial Mem at 8–9.) If the transfers were loans to MPI, by Truett's calculation he would have $35,910 in remaining debt basis going into 2012. (*See id*. at 9.) On the other hand, if the transfers were capital contributions, Truett would have gained stock basis instead of debt basis, and the payments from MPI of over $37,000 that Truett reported as interest in 2010 and 2011 should properly have been characterized as basis-reducing distributions. See IRC § 1367(a)(2)(A). Thus, if Truett's transfers to MPI were capital contributions, he had no remaining basis to claim an NOL deduction going into 2012.

It is Truett's burden to put forward evidence showing that the transfers were loans. Like all taxpayers, Truett was required to keep records sufficient to substantiate his claimed deductions. 26 CFR § 1.6001–1(a); IRC § 6001; *Brenner v. Dept. of Rev.*, 9 OTR 299, 305–06 (1983). Defendant asserts that it requested—and did not receive—records that would verify Truett's basis in MPI. (Ex D at 19.) The burden of going forward with the evidence has therefore shifted to Truett. *See* ORS 305.427; *Hillenga v. Dept. of Rev.*, TC 5086, WL 5938301 at *1 (Or Tax Oct 11, 2016) (stating taxpayers claiming NOL deduction challenged by department under ORS 305.575 must bear burden "as to the facts that are required to support the deduction").

The distinction between a shareholder loan and a capital contribution rests on the question of

"whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." *Fin Hay Realty Co. v. United States*, 398 F2d 694, 697 (3d Cir 1968). In a closely held corporation, the labels applied to the transaction by the shareholder and in the company's books "lose their meaningfulness" because "the same persons occupy both sides of the bargaining table[.]" *Id*. In such cases, "bookkeeping entries can be given little weight unless supported by some other objective evidence showing the advances to be loans[.]" *Dixie Dairies Corp. v. Comm'r*, 74 TC 476, 495 (1980). The following is a nonexclusive list of nonequally weighted factors considered by courts in evaluating transfers of funds to closely held corporations.

> "(1) the names given to the documents that would be evidence of the purported loans; (2) the presence or absence of a fixed maturity date; (3) the likely source of repayment; (4) the right to enforce payments; (5) participation in management as a result of the advances; (6) subordination of the purported loans to the loans of the corporation's creditors; (7) the intent of the parties; (8) the capitalization of the corporation; (9) the ability of the corporation to obtain financing from outside sources; (10) thinness of capital structure in relation to debt; (11) use to which the funds were put; (12) the failure of the corporation to repay; and (13) the risk involved in making the transfers."

*Glass Blocks Unlimited v. C.I.R.*, 106 TCM (CCH) 96 (2013) (citing *Calumet Indus., Inc. v. Comm'r*, 95 TC 257, 285 (1990)).

In this case, the evidence supporting the characterization of Truett's transfers as loans consists of a shareholder loan account on MPI's books and the tax returns filed by MPI and Truett. No loan documents were provided. There was no reference to shareholder loans in MPI's corporate minutes. The terms of the putative shareholder loans are unknown, including their maturity date and interest rate, as well as the rights of Truett to collect from MPI vis-à-vis Watson or any other creditor. MPI had far more debt than cash, and the high risk associated with transferring money to MPI is evidenced by Truett's statement at trial that banks refused to lend to MPI.

In light of the factors above, Truett has failed to show that his transfers were loans. It is more likely than not that the transfers were, in economic reality, capital contributions. Accordingly, Truett

had no basis going into 2012. Truett did not argue that his basis increased in 2012 or 2013, both years in which MPI reported large losses. Therefore, no NOL deduction is allowable for either year.

C.      *2012 Distributions in Excess of Basis*

A shareholder's distributions from an S corporation with no retained earnings are taxed as capital gains to the extent they exceed the shareholder's stock basis. IRC § 1368(b)(2).

Defendant calculated that the shareholder loan payable account in MPI's 2012 ledger showed $33,695.41 in personal bills, checks, credit card charges, and transfers that were not taxed because the increase to MPI's gross receipts at audit increased Truett's basis in the company. Plaintiff did not dispute Defendant's calculation or Defendant's characterization of those payments as for Truett's personal benefit. Defendant requested that if this court reversed its adjustment to MPI's gross receipts—thereby reducing Truett's basis in MPI—that Truett's distributions be taxed as capital gains.

As discussed above, the court concludes Truett's transfers to MPI were not loans and Truett did not have basis in 2012. Because Truett had not loaned money to MPI, the payments he received from the shareholder loan payable account were distributions, not loan repayments. Because Truett had no basis, those distributions should be taxed as capital gains. The court finds that Truett's distributions in excess of basis should be increased by $33,695.41 in 2012.

D.      *2012 Property Tax Payments*

Taxpayers are allowed a deduction under IRC section 162(a)(3) for business rental expenses, which include "[t]axes paid by a tenant to or for a landlord for business property." Treas Reg §1.162-11(a); *Consolidated–Hammer Dry Plate & Film Co. v. Comm'r*, 49 TC 153, 169 (1967), *aff'd*, 409 F2d 1077 (7th Cir 1969) (stating deduction for real estate taxes must be treated as rental expense). In order to claim the deduction, the tenant must be liable for the taxes under state law or under the terms of the leasehold. *Consolidated–Hammer*, 49 TC at 171

(holding tenant not entitled to rental expense deduction for taxes where not liable under state law or terms of leasehold).

Defendant asserts that MPI was not obliged to pay property taxes to the county under the terms of its lease with Watson's company.

MPI's lease provided for a base rent, plus additional rent that included the following: "2.2.2 All real property taxes which Tenant is required to pay pursuant to this Lease." (Ex 12 at 2.) Paragraph 7.2 states: "Landlord shall pay, as due, all real property taxes levied against the Premises." (*Id*. at 6.) On the same page, paragraph 7.5 states: "Tenant's responsibility for reimbursement of Tenant's pro rata share of real property taxes and assessments for the years in which this Lease commences or terminates shall be prorated based on the portion of the tax year that this Lease is in effect." (*Id*.) Finally, near the end of the lease, a provision captioned "Interpretation" states: "The parties acknowledge and agree that this is an absolute triple net Lease in which Landlord is to receive payment of rent and reimbursement by Tenant of the expenses incurred by the Landlord pursuant to the terms of this Lease." (*Id*. at 12.)

In the first step of contractual interpretation, "the court examines the text of the disputed provision, in the context of the document as a whole." *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). No further analysis is performed if the provision is clear from the "four corners" of the written contract. *Id*.

Here, MPI's lease is expressly stated to be a triple net lease. "Triple net lease" is a term of art among commercial landlords and tenants. It is "[a] lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management." *The Dictionary of Real Estate Appraisal* 134 (5th ed. 2010), *s.v.* "net net net lease." Property taxes are among those fixed

expenses assumed by the tenant in a triple net lease—they are "[o]perating expenses that generally do not vary with occupancy and that prudent management will pay whether the property is occupied or vacant." *The Dictionary of Real Estate Appraisal* 81 (5th ed. 2010), *s.v.* "fixed expenses."

With the understanding that a tenant in a triple net lease is responsible for property taxes, the provisions of MPI's lease become clear. They set the mechanism for the tenant's tax payment. The landlord pays the taxes "as due," and the tenant reimburses the landlord. That mechanism protects the landlord from losing a leased property to a tax foreclosure. However, it does not release the tenant from its obligation to pay the taxes.

In MPI's case, the landlord did not pay the taxes as due; significant interest had accumulated by the time MPI paid them. It is true that MPI's payment directly to the tax collector was not required by its lease. However, the key point is that MPI was liable for the property taxes under the lease. MPI's reason for paying the taxes in a different way is unknown—perhaps it was asked to do so by its landlord; perhaps it was curing its landlord's failure to timely pay the taxes. Still, MPI was paying an expense it was obligated by its lease to pay, and that expense qualifies for a deduction under IRC section 162(a)(3). The court finds that MPI's payment of property taxes was made "for a landlord for business property," and Defendant should have allowed its claimed $3,032 deduction.[8]

### III. CONCLUSION

Truett has shown MPI is entitled to a reduction in its gross receipts. Truett is not entitled to NOL deductions in 2012 or 2013 because he had no basis in MPI. Likewise, the distributions Truett received in 2012 were in excess of his basis. Truett is entitled to a deduction for MPI's

---

[8] Plaintiff did not request the court to increase its deduction to $3,056.54, the amount of its payment credited as tax by the tax collector.

property tax payment in 2012.  Now, therefore,

IT IS THE DECISION OF THIS COURT that MPI's gross receipts were $392,977 in 2012 and $368,943 in 2013.

IT IS FURTHER DECIDED that Plaintiff's carryover net operating loss deduction is denied for 2012 and 2013.

IT IS FURTHER DECIDED that Plaintiff received $33,695.41 of distributions in excess of his basis from MPI in 2012.

IT IS FURTHER DECIDED that Plaintiff's deduction of $3,032 for a 2012 property tax payment is allowed.

IT IS FURTHER DECIDED that, as stipulated by the parties, Plaintiff realized no capital gain on the sale of his property in Jasper County, Texas.

Dated this ____ day of March, 2018.


POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Lundgren and entered on March 13, 2018.*