IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

| | | |
|---|---|---|
| CHARLES A. RINGO, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 220012R |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF REVENUE, | ) | |
| State of Oregon, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appealed Defendant's Notice of Assessment, dated October 26, 2021, for the 2018 tax year.[1] Plaintiff disputes Defendant's assessment of estimated unreported gross receipts, based on alleged illegal marijuana sales.[2]

Trial was held on September 18 and 19, 2023, in the Oregon Tax Court. Charles A. Ringo (Plaintiff) appeared and testified on his own behalf. Darren Weirnick, Kristin Gallino, and Patrick Reider, Assistant Attorneys General, appeared on behalf of Defendant. Testifying for Defendant were Joshua Lawson, auditor; Thomas Sheehy, Director of Analytics and Research for the Oregon Liquor and Cannabis Commission (OLCC); and Lt. Tyler Bechtel, drug enforcement officer with the Oregon State Police. Plaintiff's Exhibits 1 to 31, 34 to 38, 40 to 66, 68 to 71 (except pages 8 to 11), 76, 77 and 79 were received into evidence. Defendant's Exhibits A to II were received into evidence.

/ / /

---

[1] The Notice of Assessment and the Complaint also named Julie A. Ringo. Defendant granted her Innocent Spouse Relief pursuant to ORS 316.369, and she was removed from the appeal by an Order dated November 20, 2023.

[2] The Notice of Assessment also adjusted the business' cost of goods sold. Plaintiff did not contest that issue.

# I. STATEMENT OF FACTS

Plaintiff is a former Oregon attorney and former member of the Oregon Legislature. Following the passage of the Control, Regulation, and Taxation of Marijuana and Industrial Hemp Act (otherwise known as Ballot Measure 91) that legalized recreational marijuana in Oregon, Plaintiff entered the cannabis industry to start what he believed would be a lucrative business. However, Plaintiff testified that he later discovered that the industry was "fraught with landmines." The court begins by briefly describing Plaintiff's business as background.

## A.    *Formation of Byzantium Corp. and Early Operations*

Plaintiff testified that in 2016 he formed Byzantium Corp. ("BC") as an "S" corporation with Leonard Peverieri (Peverieri ) for the purpose of cultivating cannabis. Plaintiff owned 85 percent of the corporation and Peverieri held a 15 percent stake. BC initially obtained a medical marijuana provider's license before pursuing a recreational marijuana license.

BC began growing cannabis on a 20-acre property owned by Peverieri. While awaiting recreational licensure, Plaintiff moved cannabis plants from the BC's grow facility to Peverieri's barn to conceal unlicensed inventory during a pre-licensing inspection by the OLCC. (Def's Ex N at 25.) On November 2, 2017, BC, operating under the name High Cascade Farms ("HCF"), was granted a Marijuana Producer License by the OLCC, permitting the cultivation of recreational cannabis. (Def's Ex K.)

Plaintiff testified that he initially intended to operate the business lawfully. However, after several crops failed pesticide tests, Plaintiff admitted that he "crossed the line" and began conducting operations illegally. Plaintiff admitted that BC made only one legal sale during all of 2017 and 2018, the years when BC was operating, and that all other transactions occurred *outside* of lawful channels.

B.      *Financial Maneuvering and Banking Issues*

In 2016, Plaintiff opened a credit union account for BC.  The account was later closed by the institution due to the business remaining unlawful at the federal level.  He subsequently opened a bank account under the name "Epic Coffee," and falsely described the business as "provides coffee to customers at coffee shop."  (Def's Ex S-2 at 53.)  Plaintiff also used other accounts, including those under the names Desert Sky LLC, R Bar R, LLC, and his attorney business account, to deposit cash from cannabis sales.

To avoid federal bank scrutiny, Plaintiff testified that he limited cash deposits to $9,000.  BC's 2018 tax return reported $35,500 in cannabis sales and $17,000 in rental income, though not all the income appeared in bank records submitted to the court.  Plaintiff testified that employees were paid in cash, with no Form 1099s issued.  Some employees were unpaid but promised future compensation from profits.

Defendant's auditor, Lawson, testified that during an audit interview, Plaintiff admitted to traveling to Cincinnati to sell cannabis but claimed that 70 pounds of product were stolen from his vehicle.  BC's Epic Coffee bank account shows a $9,000 cash deposit on February 12, 2018, in Branford, Connecticut.  Plaintiff denied selling cannabis in Connecticut despite the February 12, 2018, in-person deposit recorded on BC's bank statement.  (Def's Ex S-2 at 6, 40.)  Plaintiff opined that the deposit was a wire transfer.  No other documents were provided to explain the transaction.[3]  The gaps in BC's financial records and noncompliance with regulatory requirements also extended to its marijuana controls, which the court turns to next.

---

[3] Plaintiff declined to answer further questions about his travel and cited his attorney's advice to invoke his rights under the Fifth Amendment to the United States Constitution.  Plaintiff cites *John Deere Company v. Epstein*, 307 Or 348, 769 P2d 766 (1989) for proposition the during a civil action "inference may not be drawn from party's assertion of Fifth Amendment right not to testify."  Although the Magistrate Division is not bound by technical rules of evidence, the court will not draw any adverse inference from his invocation.

C.    *METRC and the OLCC*

Sheehy, OLCC Director of Analytics and Research for the cannabis section, explained that after Oregon legalized recreational cannabis, the federal government made an agreement with several states that it would not enforce federal marijuana laws if the states tracked and controlled over-production and prevented illegal interstate sales.[4]  The OLCC created a program known as the Marijuana Enforcement Tracking Reporting Compliance system (METRC) which requires seed-to-sale tracking of marijuana using barcodes, tags, 24-hour video surveillance, and visitor logs.  (Ptf's Ex 82 at 4.)  The system requires periodic updates for stages of growth, drying, and disposal or sale.  Tags and bar codes are attached to the growing plants, and to containers with seeds or cannabis related materials.  Plaintiff and an employee, Andy, were the only individuals authorized to input data into BC's METRC account.

Sheehy testified that new licensees were given 90-days to transfer in product without scrutiny.  On or near the 90-day deadline BC's METRC account shows the transfer of hundreds of types of seeds to their facility on February 2, 2018.  (Def's Ex CC-4)  None of those seeds were reported as transferred out or destroyed, but they were not found on BC's premises when police and OLCC raided BC facilities in April 2018.  Plaintiff's METRC data shows that in 2018, BC wasted 519 pounds of its 634-pound harvest (81 percent of harvest wasted).  (Ptf's Ex 36.)

Sheehy stated that based on his review of Plaintiff's METRC records, he found that BC did not accurately report material coming in or out of its facility.  He also found that there were

---

[4] The agreement from the United States Department of Justice is often referred to as the "Cole Memorandum."  Guidance Regarding Marijuana Enforcement, dated August 29, 2013, to all United States Attorneys, from Deputy Attorney General James M. Cole.
https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf

more and different types of plants and seeds at the facility than reported in METRC. Sheehy testified that based upon his review and the inaccuracies found, he could not rely on BC's METRC data to estimate the amount of cannabis produced by BC. Sheehy found that BC did not maintain video as required and the visitor logs contained names which were blacked out. Difficulties with BC's operations led Plaintiff to seek an exit from the marijuana business by marketing BC as being for sale.

D. *Internal Disputes and Attempting to Sell Byzantium Corp.*

In late 2017 or early 2018, Plaintiff testified that he created a flyer advertising HCF for sale at $450,000. The flyer touted the property's 20-acre size, a Tier II recreational license permitting up to 10,000 square feet of canopy, license approval on November 2, 2017, and an annual production capacity of 2,100 pounds. (Def's Ex J.) Plaintiff testified that these figures were exaggerated marketing claims. The flyer included pictures showing a full indoor canopy of plants with grow lights.

By early 2018, Plaintiff and Peverieri were in conflict over profits, culminating in litigation. Plaintiff attempted to sublet the BC property and Peverieri refused. Peverieri accused Plaintiff of withholding profits, and Plaintiff alleged that Peverieri had made "black market" cannabis sales. No records substantiate the facts to verify either allegation. (Def's Ex FF at 3, GG at 7.)

E. *Illegal Sales and Operation Issues*

Plaintiff hired David Paulsen (Paulsen) as BC's primary grower, describing him alternately as an independent contractor and a "type of partner." Paulsen was not formally paid, and no 1099s were issued to him from BC. Paulsen was not legally allowed to work at High Cascade Farms per OLCC. (Ptf's Ex 18 at 5.) Plaintiff testified that Paulsen made most of BC's

sales and remitted only a portion of proceeds back to Plaintiff. No records of any kind were kept of these transactions.

F. *Explosion at Paulsen's Residence*

On March 18, 2018, a large explosion occurred at Paulsen's residence. (Ptf's Ex 18 at 1.) Police determined the cause to be the illegal manufacture of butane honey oil (BHO) using an open blasting method. (Ptf's Ex 18 at 3.) During the investigation of the explosion, Police discovered 34 pounds of cannabis and METRC tags linked to HCF that had been reported to be in the flowering state as of January 2, 2018. (Ptf's Ex 18 at 4, 5.) This led to further scrutiny from OLCC, revealing that some of the marijuana reported destroyed due to pesticide contamination were found at Paulsen's residence. (Ptf's Ex 18 at 6.)

G. *Plant Destruction and Theft Allegations*

During the course of BC's operations, Plaintiff testified that there were two instances of theft; one theft involved a loss of 70 pounds of cannabis, and another of 15 pounds. Plaintiff has no records relating to the theft and did not file police reports.

Plaintiff testified that on March 21, 2018, Plaintiff decided to destroy all remaining cannabis plants, except for a few in the vegetative room. He testified that the destroyed plants were composted and buried. Plaintiff instructed his employee to report the destruction of all products in the METRC system.

H. *Search Warrant Execution*

On April 19, 2018, law enforcement executed a search warrant at BC's facility, seizing various items, including seeds, bags, METRC labels, plants, 465 grams of marijuana extract and about 107 pounds of marijuana. (Ptf's Ex 19 at 1-4.) After the search, Plaintiff testified he destroyed the only records of BC's cannabis sales in order to avoid prosecution.

I.     *Stipulation with OLCC*

In August 2018, Plaintiff entered into a stipulation with OLCC admitting to several violations, including transporting marijuana to unauthorized locations, misrepresenting plant destruction records, failure to account transparently for inventory tracking data, and intentionally misrepresenting destruction of plants that were recovered at Paulsen's home where BHO was being manufactured. (Ptf's Ex 20.) Plaintiff also admitted that BC reported as destroyed plants that were still in its drying room. (*Id*. at 7.) Plaintiff agreed that BC "intentionally destroyed, damaged, altered, removed or concealed potential evidence" in blacking out entries in the Visitors Logbook, did not explain 268 unaccounted packages of cannabis seeds reported in the tracking system, and grew cannabis without the required tags.

J.     *Defendant's Audit and Trial Evidence*

Plaintiff reported $52,500 in marijuana sales and a net loss of $21,018 on federal Form 1120S. (Ptf's Ex 34 at 1.) He presented a one-page handwritten ledger, recreated after he destroyed the original sales records, in support of his sales figure. (Ptf's Ex 32.) Plaintiff reported a pass-through loss of $17,865 as to his proportion of the corporation. (Ptf's Ex 34 at 1.) Following an audit, Defendant adjusted BC's loss to a profit of $370,708 by increasing sales income by $369,777 and decreasing labor by $21,949. (*Id*. at 2.) In its audit, the Department found BC's income from sales as follows:

| | |
|---|---|
| Inventory originally claimed as disposed: | 519.04 lbs. |
| Inventory available for sale in METRC: | 115.81 |
| Less police Seizure: | 107 lbs. |
| Total inventory for sale: | 527.85 lbs. |
| Average sale per pound per Plaintiff's information: | $800 |
| Estimated FMV of adjusted inventory | $422,277 |

(Def's Ex A at 2-3.) The conference officer analyzed the audit and accepted additional information from Plaintiff. The conference officer considered the auditor's estimates against BC

inventory records, METRC data, and Plaintiff's own admissions, and concluded that Plaintiff significantly underreported his income. Although the officer opined a different estimate, he sustained the estimate found during the audit and denied Plaintiff's appeal. (Ptf's Ex 34 at 6.)

On behalf of Defendant, Bechtel presented three methods for estimating the total weight of salable marijuana that BC produced and would be available for sale in 2018. Bechtel testified that he made estimates using a "downward bias" giving Plaintiff the "benefit of the doubt."

The first method estimated production based on BC's flyer advertising the business for sale. (Def's Ex J.) In the flyer, Plaintiff stated the BC facility can grow "3 crops a year" that allowed an "annual production of approximately 2,100 lbs," and pictures show a large quantity of growing plants. (*Id.*) Bechtel used those figures to equate a monthly harvest of 50 pounds. Using the October 2017 harvest from two greenhouses and the indoor harvest in 2018, Bechtel estimated that 675 pounds of usable marijuana was available for sale in 2018 based upon the flyer's information.

The second method relied on calculated estimates from the square footage used for cultivation. Bechtel estimated that 80 greenhouse grown plants, with each plant yielding 600 grams, would result in 48,000 grams or 105.9 pounds of marijuana. With two greenhouses, the October 2017 harvest should have produced just over 211 pounds of usable marijuana available for sale in 2018. In addition to the greenhouse capacity, Bechtel determined the indoor grow capacity would add another 94 pounds. Putting the figures together, Bechtel estimated one harvest from the two greenhouses and 3.5 indoor harvests for an estimated total of 540.8 pounds available for sale in 2018.

/ / /

/ / /

The third method was a DEA average yield per plant for greenhouses plus grams per watt use for indoor growing. Using an estimate of one gram of salable marijuana for every watt of light used for indoor grow, this method produced an estimate of 497 pounds of marijuana.

Defendant offered Bechtel's three estimates of 675 pounds, 540.8 pounds, and 497 pounds to demonstrate the reasonableness of the 527.85 pounds estimate the auditor used for the amount of inventory BC was likely to have produced.

## II. ANALYSIS

This case focuses on the tax liability arising from Plaintiff's 85 percent interest in BC. Defendant issued a Notice of Assessment after determining that Plaintiff underreported BC's gross receipts for the 2018 tax year that passed through to Plaintiff. While BC reported $17,000 from a facility sublease, Defendant asserts that BC's reported cannabis sales of $35,000 were significantly understated. The issue is whether Plaintiff's reported income accurately reflects BC's gross receipts and whether Defendant's estimate of additional unreported income is reasonable under the circumstances.

Oregon personal income tax law is generally "identical in effect to the provisions of the Internal Revenue Code relating to the measurement of taxable income of individuals," including with respect to income of shareholders of S corporations. *See* ORS 316.007(1); ORS 316.012; ORS 316.022(6); ORS 316.048; ORS 314.732; ORS 314.734.[5] The Internal Revenue Code (IRC) defines gross income as "all income from whatever source derived," even income from illegal activities. *See* IRC § 61(a); *James v United States*, 366 US 213, 81 S Ct 1052, 61 LE 2d 246 (1961). Taxpayers are required to maintain adequate records substantiating their income and expenses. Treas Reg § 1.6001-1(a); ORS 314.425. If a taxpayer fails to maintain such records,

_____

[5] All references to the Oregon Revised Statutes (ORS) are to the 2017 edition.

the department may estimate unreported income using "any practicable proof" that is "available under the circumstances of the particular situation." *Brenner v. Dept. of Rev.*, 9 OTR 299, 306 (1983).

As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence, which "means the greater weight of evidence, the more convincing evidence." ORS 305.427; *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [their] burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). With Plaintiff bearing the burden of proof in this case, the court's analysis begins by evaluating the evidence he proffered of BC's income and expenses.

A.      *Records of BC's Income and Expenses*

Plaintiff argued that he alone has first-hand knowledge of BC's income, which he testified to, and, therefore, asserts that he met his burden of proof. He admits that all but one of BC's cannabis sales were illegal, asserting that this admission bolsters his credibility. He also claimed that BC's gross receipts of $52,500–including $17,000 in rental income--were accurately reported.

While Plaintiff's trial demeanor and admission of criminal activity lend some support to his credibility, the court finds his testimony unreliable. Plaintiff's admissions are against his interest, but they are not new revelations. Plaintiff had already implicated himself in prior criminal, civil, and administrative proceedings. His trial testimony revealed only what Defendant already knew. Multiple factors undermine Plaintiff's credibility as described below.

/ / /

/ / /

### 1. *Intentional destruction of BC's business records*

Plaintiff admitted he intentionally destroyed BC's business records to avoid prosecution. The one-page recreated sales record he presented is self-serving and unsupported by independent evidence, such as bank statements. (Ptf's Ex 32.) His testimony, though detailed, lacks credible corroborating evidence. Plaintiff's testimony is further undermined by his admissions of illegal sales, as contained in the OLCC license revocation. (Ptf's Ex 20 at 1, 6).

### 2. *Manipulation of METRC records*

Based upon Plaintiff's testimony and Sheehy's review of the METRC records, every aspect of BC's data input into the METRC system appears to have been intentionally false, including false seed acquisitions, and false destruction reports. Plaintiff was clearly aware that employees and partners were taking BC's product for sale and yet even without any record keeping, he recklessly and without any supporting information stated that those sales were accounted for in the bank deposits. Courts are not required to accept uncorroborated, self-serving statements, even where there is no direct evidence to the contrary. *Wood v Comm'r*, 338 F2d 602, 605 (9th Cir 1964).

Worse, BC's METRC records were not just unreliable, they were deliberately manipulated and demonstrated an intent to deceive. Just before licensure, BC reported transferring hundreds of seeds and strains into its facility, which Plaintiff claimed reflected the unreliability of the METRC system. The court finds instead that the records were falsified to facilitate illegal activity, including justifying the acquisition of plants from unauthorized sources.

### 3. *Contradictions in testimony and evidence*

Plaintiff acknowledged out of state travel for at least one illegal sale, and bank records indicate cash deposits in another state that Plaintiff denied being an illegal cannabis sale.

However, Plaintiff's proffered explanation that the transaction was a wire transfer is contradicted by the existing records. (Def's Ex S-2 at 6, 40.) Plaintiff failed to provide other documents to resolve this discrepancy, nor did he explain why the existing records were incorrect. These contradictions further erode his credibility and suggest other undisclosed transactions.

Plaintiff prepared an advertisement for the sale of BC with pictures that clearly showed significant plant stock and assertions of significant growing capacity. His rejection of that evidence as mere sales puffery is not persuasive. Plaintiff also did not present persuasive testimony on what happened to the plants depicted in the photographs.

While Plaintiff asserted that most of BC's crop was destroyed due to pesticide contamination, the evidence for that explanation relies on METRC records, which have already been determined to be false. Plaintiff's self-serving testimony about many pounds of stolen cannabis was also unsupported by any documentary evidence.

4. *Unpaid workers and improper transactions*

BC paid workers in cash from sale proceeds, but those transactions were unaccounted for. Plaintiff testified that employees such as Paulsen conducted sales on BC's behalf. However, there are no records to document these transactions. Plaintiff's claim that he was unaware of Paulsen's use of BC-tagged items that were intentionally reported in METRC as destroyed was not credible. The court finds more likely that Plaintiff made the false reports or an employee did so under his direction.

5. *Tampered surveillance and visitor logs*

The OLCC investigation revealed a lack of video recordings required for BC's facilities. It was also discovered that the visitor logs, designed to prevent criminal activity, were altered with redacted names. These facts further support the conclusion of intentional evasion of the

regulations aimed at preventing unlawful activity, and for which Plaintiff was unable to provide a compelling explanation.

In summary, Plaintiff's testimony and evidence are unsupported, inconsistent, and unreliable. The argument that his firsthand knowledge suffices to meet his burden of proof is unpersuasive in light of the overwhelming evidence of misrepresentation of BC's activities.

B.      *Defendant's Estimate of BC's Income*

Defendant relied on the auditor's estimation of BC's cannabis inventory that multiple other estimations methods returned comparable inventory estimates for. Plaintiff argues that these estimates are inherently inexact and could allow the Defendant to manufacture arbitrary figures shielded by Plaintiff's burden of proof. However, Plaintiff's failure to maintain adequate records and willful destruction of sales records left Defendant with no choice but to estimate BC's income.

While the court acknowledges the potential for misuse in estimation methods, that is not the case here. Defendant employed multiple estimation methodologies, all of which supported the auditor's original figures. Courts have long recognized that revenue authorities may rely on reasonable estimates when taxpayers fail to maintain adequate records. *See e.g.*, *Petzoldt v Comm'r*, 92 TC 37, CCH 9237 (March 29, 1989) (giving greater latitude in determining which method of reconstruction of income to apply where the case involves an illegal enterprise, returns showing nominal tax liability, and there are no business records).

Rather than pursuing higher sales figures suggested at trial, Defendant adhered to the amount stated in the Notice of Assessment. The court finds no reason to scrutinize each estimate methodology here in detail. It is sufficient to conclude that Defendant's estimates were reasonable.

III. CONCLUSION

After careful consideration, the court finds that Plaintiff failed to meet his burden of proof. His testimony was not credible, and his recreated records lack reliability. Defendant's estimate, by contrast, is reasonable and consistent with the evidence.

Taxpayers bear the responsibility of maintaining accurate business records. When they fail to do so, taxing authorities are entitled to use reasonable methods to estimate income. Plaintiff's attempt to shift the burden to Defendant is unavailing. Accordingly, the court upholds the Notice of Assessment. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.


_____
RICHARD D. DAVIS

***If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.***

***This Decision was signed by Magistrate Richard D. Davis and entered on February 10, 2025.***